Ronny Joe BROWN, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 3–85–255–CR.

Court of Appeals of Texas,
Austin.

Feb. 18, 1987.

Allen Cazier, Holland, Barbour, Cazier & Holland, San Antonio, for appellant.

Ronald Earle, Dist. Atty., Terrence Keel, Asst. Dist. Atty., Austin, for appellee.

Before SHANNON, C.J., and BRADY and CARROLL, JJ.

PER CURIAM.

Appellant was convicted of the offense of injury to a child. Tex.Pen. Code Ann. § 22.04(a)(1) (Supp.1987). The jury assessed punishment at imprisonment for sixty-five years. We will affirm the judgment of conviction.

## I.

In his first point of error, appellant contends the trial court erred in admitting into

evidence three incriminating recordings (one audiotape and two videotapes) of questioning sessions he underwent before his formal arrest. Appellant argues specifically that he was in custody without a warrant and without probable cause at the times of the questioning, and that the recordings are therefore "tainted" and inadmissible. *See Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Self v. State,* 709 S.W.2d 662 (Tex.Cr.App.1986); 3 LaFave, *Search and Seizure* § 11.4(b) (1987).

In response to appellant's motion to suppress the three recordings, the trial court conducted a pretrial hearing to determine whether appellant was in custody unlawfully at the times the recordings were made. *See* Tex.Code C.P.Ann. art. 28.01, § 1(6) (Supp.1987). Appellant and police officers Howard K. Hall and Bruce Boardman testified at the hearing. Appellant testified that he took the victim, the 21–month–old daughter of his girlfriend, in his pickup truck to a minor-emergency clinic in Austin at approximately 11:15 a.m., Wednesday, April 10, 1985; that shortly after his arrival, several uniformed police officers arrived in three marked police vehicles; and that two of the officers asked him to accompany them alone to a back room of the clinic where he was questioned briefly regarding the child's injuries. His testimony continued:

Q Let me ask you this, from the minor-emergency clinic, where did you go? Where did you go next?

A We went to the hospital.[1]

Q How did you get there?

A I rode in the front seat of one of the police cars with an officer.

Q Why did you go to the hospital with the police officer?

A I felt that—first off, they asked me if I would go ahead and go with them.

Q What did you say?

A I said, Well, sir, my vehicle's—I brought the child to the clinic in my vehicle and I'd much rather—or is there any reason why I can't drive my own vehicle down there, and they said, No, we need you to go and come with us, and I went ahead and explained that I didn't feel comfortable

1. The child was transferred by ambulance from the minor-emergency clinic to Austin's Brackenridge Hospital.

leaving my truck on the outside of the building there.

·   ·   ·   ·   ·

Q Did you express to the officer that you would like to drive your own pickup truck?

A I did.

Q Did they permit you to do so?

A No.

·   ·   ·   ·   ·

Q Okay. Now, did the uniformed officer that brought you to the hospital stay with you the whole time that you were at the hospital?

A He did.

Q Did there come a time when you asked to go to the men's room?

A Yes, sir.

Q Okay, how did that work?

A It was like 15 minutes after we'd got there, I'd asked the officer if it would be all right if I could use the restroom and he said, Yes, it's right outside the door there, and I got up and he followed me over to the door and I went in and he waited there until I got through.

Q When you came out of the restroom, was he there waiting for you?

A He was.

Appellant related further that after he finished in the hospital's restroom, he was questioned by several police officers in a small, back room and that this questioning was audiotaped.[2] His testimony continued:

Q Now, from the hospital, you went where?

A They had asked me about taking them back to [my residence] to show them what happened.

Q And how did you get from the hospital to [your residence]?

A In an unmarked car.

Q Okay. Was it a police car?

A Yes, sir.

Q Were you taken there by a policeman?

A Yes, sir.

Q Now, after the events that occurred at [your residence] with the police

officers …, where did you go from there?

A Okay. They had asked me—I believe I had told them that I wanted to go back to the hospital and they had informed me that I needed to go to the station with them.

Q "They" being who?

A For sure it was Officer Boardman.

Q Officer Boardman told you that you needed to go to the station with him; is that correct?

A Uh-huh. I was asking him more or less what was the next step and what else they wanted me to do, and he told me that I probably needed to talk to Sergeant Hall one more time and sign a statement.

Q And did you have any conversation with Sergeant Boardman at that time before returning to the police station or before going to the police station for the first time, I should say, about your pickup truck?

A Yes, sir.

Q What did you tell Sergeant Boardman about your pickup truck?

A I told him that I was still worried about my pickup truck because I'd asked an officer earlier whether I could go ahead and use it to do all this running around in because I was worried about it being towed off at the minor emergency clinic and he told me, No, not to worry about it, and I needed to come with them until they were through.

Q Had any of these officers ever handcuffed you?

A No.

Q Did they ever tell you that you were under arrest?

A No.

·   ·   ·   ·   ·

Q And you were never told that you were not free to leave?

A No.

Q And in fact, you were asked on several occasions whether, in fact, your movement had been in any way restricted; is not that correct? Ser-

**2.** This audiotaped questioning (state's exhibit no. 25) commenced at approximately 12:02 p.m. On the audiotape, appellant stated *inter alia* that the child sustained injury that morning (Wednesday, April 10, 1985) and on the previous Friday (April 5); that on both occasions the child was in his care alone; and that he believed the injuries were caused by the child falling down stairs. Sergeant Howard K. Hall stated on the audiotape before the questioning that the child "appears to have been beaten."

geant Boardman asked you that, for instance, on the second videotape? [3]

A Right.

Q And you told him that you understood that you had not been in any way restricted to that point. Isn't that true?

A Well, I more or less—well, could you repeat that again?

Q Sergeant Boardman asked you on the second videotape, has anybody told you at any time before right now that your movement—no one has—has anyone ever told you at any time prior to right now that your movements have been restricted or that you couldn't do anything that you wanted to do or go anywhere that you wanted to go?

He asked you that question, didn't he?

A I believe he did.

Q And you told him, No, no one has ever told me any of those things?

A I may have told him no, but that wasn't what I was thinking.

Q Well, did you tell him yes or did you tell him no?

A I told him that no, I hadn't been restricted.

Q But it was all a big mistake?

A Right, because he was aware that I was pushing him to let me use my vehicle, and I didn't feel that it would do any good to argue with him.

. . . . .

Q You, in fact, gave your permission for the officers to go out there to the apartment with you, didn't you?

A They had asked me.

Q They asked for your permission and you gave it?

A Right. I said I didn't see any reason why not.

Q And they didn't do anything to threaten you to give that permission, did they?

A No.

Q They didn't use any force against you or anything like that, did they?

A No.

Q They didn't coerce you in any way, did they?

A Coerce me? I don't know what that means.

Q Force you to do it?

A No.

Q And in fact, Officer Boardman, after you finished there at the duplex, asked you, did he not, Do you have any objections to going down to the police department with us, just like he testified?

A I'd said, No.

Q And you said, No, I don't have any objections?

A No. I was under the impression that this was the final stage of telling them—telling them what they wanted to know.

Q So you were basically trying to please the police officers?

A Right.

Q And you basically asked them what else—what else they wanted you to do? Is that what your testimony was?

A Right. Well, the whole process was taking three or four hours, and the whole time I was trying to get to the hospital and notify the child's mom or make sure that the mom knew what was going on instead of just taking her—their word for it.

Howard K. Hall testified that he viewed the unconscious child at the hospital at approximately 12:00 p.m. on the day in question; that he "realized the child was injured very seriously"; that to his knowledge appellant was not in custody at the time appellant arrived at the hospital; that he audiotaped a discussion he and other officers had with appellant in a "family room" at the hospital; that appellant voluntarily accompanied the officers to the family room; that he administered the *Mi-*

---

**3.** Appellant made two videotaped statements (state's exhibit nos. 45 and 46) at the police station late on the afternoon of Wednesday, April 10. On the videotapes, appellant stated *inter alia* that (1) the child fell down carpeted stairs on Friday, April 5, 1985; (2) after that fall, the child had no injuries other that a

"bump" on her head; (3) on that same day, he struck the child's head several times with his fist out of anger and stress; (4) on Wednesday, April 10, he struck the child again several times; and (5) his blows were not hard enough to cause injury.

*randa*[4] warnings to appellant at the beginning of the discussion although appellant was not in custody at that time; and that he did nothing that might have indicated to appellant that he was in custody.

Bruce Boardman testified that he received a telephone call at approximately 11:45 a.m. on the day in question from a police officer at the minor-emergency clinic; that the officer informed him that the clinic physician suspected the child had been assaulted although appellant claimed the injuries were caused by an accidental fall down stairs; and that he participated in the questioning of appellant at the hospital. His testimony continued:

Q   And did you have any further contact with the defendant that day?

A   Yes, sir. Later, after the victim's mother ... arrived, we—or my sergeant—Sergeant Hall had obtained permission from Ronny Brown and [the mother] to go back to the location where the victim had allegedly fallen down the stairs so that we could photograph the area.

Q   And who went out to that location?

A   Myself, Sergeant McDavid and Officer John Jones.

Q   Did you foresee that Mr. Brown was under arrest at that time?

A   No, sir.

Q   Was he handcuffed?

A   No, sir, he was not.

Q   What happened when you arrived there at the apartment?

A   Mr. Brown had the keys to the residence. He went in and invited us into the residence.

Q   What happened after you went in?

A   When we initially got there, we walked in towards the—well, we walked in through a living area and then there was a kitchen on the left. I saw a bag of marijuana on the tray on the kitchen table. Mr. Brown walked immediately over to that tray and picked up a bag of marijuana and nonchalantly tried to throw it in the trash, and I told him at that point that I was not concerned about him and his

marijuana and requested that he put it back on the kitchen table and that he was not under arrest and I had no intention of arresting him for possession of marijuana.

Q   Did he do so?

A   Yes, he did.

Q   Okay, what—how long were you-all at the apartment?

A   Approximately—I'd say two hours, minimum.

Q   And what did you do during the period of time that you were at the apartment?

A   We asked that—if Ronny had any objections to showing us what had occurred that morning from the time he got up until he noticed that the child was acting strangely and that he made a decision to seek medical treatment for the child.

Q   Okay, did he do so?

A   He did.

.        .        .        .        .

Q   Was any—any other work or was there any other activity that occurred there at the apartment?

A   Yes, sir, there were—I asked him if he had any objections to me going upstairs and looking around. He said no. I went upstairs and examined the baby's room. I found a suspicious red spot next to the bed on the left-hand side as you're facing the foot of the bed. It appeared to be damp. I thought it to be blood at the beginning.

I also noticed a large stain on the floor that was still damp. I could smell what smelled like coffee on the floor. There was another suspicious stain on the floor. I asked Mr. Brown if he could explain what these were and he explained to me that he had spilled some coffee down there and that he really didn't know what the red spot was.

.        .        .        .        .

Q   What happened then after those activities were completed at the apartment?

---

4.  *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant does not dispute he was given the proper *Miranda* warn-

ings at all the relevant times; thus, no Fifth Amendment "voluntariness" issue is presented as to appellant's statements to the police.

A  After we completed that, I asked Mr. Brown if he had any objections to accompanying myself and Sergeant McDavid to the police department so that we could get a more precise statement of facts that occurred, due to the critical nature and the injuries on the child.

Q  Okay.  Let me be very precise.  Did you tell him that he was going to accompany you or did you ask him if he had any objections to coming with you?

A  I asked him in those words, Do you have any objections to coming to the Austin Police Department and giving me a more precise statement.  He said he had no objection.

Q  And did he, in fact, accompany you there?

A  Yes, he did.

Q  Would you describe to the Court where you went with Mr. Brown upon your arrival at the police station?

A  Upon our arrival at the police department, we arrived, entered the police department, I believe, on the second floor.  Mr. Brown was left at the reception area.  Myself, I went back to Homicide Detail where I was joined by Sergeant Schmidt.

At that point, Sergeant Schmidt asked if he minded doing a videotape.  There was a period of time when we were preparing the room, having to collect videotapes.  We were—asked Mr. Brown if he minded waiting out in the reception area until we prepared the room.

He had no objection to videotaping. He verbally said he had no objection and that that would be the more precise form rather than dictating it.

Q  How long was Mr. Brown out in the reception area?

A  At least five to ten minutes.

Q  Did anybody stay with him during this period of time?

A  No, sir.

Q  Was he guarded in any fashion?

A  No, sir, he was not.

There was no testimony from the police officers who questioned appellant at the minor-emergency clinic and then transported him to the hospital.

At the end of the hearing, the trial court, holding the three recordings admissible, made the following oral conclusions:

I'm willing at this time to overrule the Motion to Suppress.  I don't think there's any question in this case that based upon the information that the officers had, that that definitely justified investigative detention, if nothing else, and it seems to me that most of the action goes, if not all of the action that occurred prior to his formally being placed under arrest would constitute investigative detention.

.        .        .        .        .

I think that at some point along this continuum, which there's quite a bit of evidence as to what happened in this case—at some point, probable cause did arise and prior to that time, it does seem to me that there was a lot of investigative detention going on, and I can't see that the officer really had any choice other than to talk to this witness since he was the only witness that they knew existed, and it seems to me initially when they did talk to him, it was not really a detention at all but rather talking to a witness.

I think at some point after that it became investigative detention and some point after that, I think it became probable cause to make an arrest and it did become an arrest.  So if the Fourth Amendment question is the only thing we're talking about, I'm going to overrule the Motion to Suppress right now.

### A.

Appellant had the burden of proving he was in custody at the times he underwent the recorded interrogations.  *Russell v. State,* 717 S.W.2d 7 (Tex.Cr.App.1986).  To prove he was in custody, appellant had to prove facts that would have, as a matter of law, led a reasonable person in appellant's position to believe he was significantly deprived of his freedom of action at the relevant times.  *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Russell v. State, supra; see* 2 La-Fave, *Search and Seizure* § 5.1(a) (1987). Examples of circumstances that might indicate custody, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physi-

cal touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *U.S. v. Mendenhall, supra* at 555, 100 S.Ct. at 1877.

■ After reviewing the relevant evidence, we conclude that appellant did not prove he was significantly deprived of his liberty at the time he underwent the audiotaped questioning in the hospital family room. First, there is little evidence as to what transpired at the time appellant first encountered the police at the minor-emergency clinic; the evidence shows only that appellant was briefly asked (unspecified) questions regarding the child's injuries. Second, although the police officers at the clinic allegedly insisted that appellant ride with them in the police car to the hospital, there is no evidence that he was questioned while in the police car, and it is apparent that appellant intended to go to the hospital anyway. Indeed, appellant's testimony shows clearly that his principal concern was merely that his truck, parked at the clinic, might be towed away. Third, appellant does not claim that his statements to the police at the hospital were coerced. Fourth, although appellant was in the company of several policemen while at the hospital, there is no evidence that they touched him in a menacing manner or otherwise displayed any hostility toward him. Finally, we are unpersuaded that a reasonable person in appellant's position would have thought he was in custody because a policeman waited *outside* a hospital restroom while that person was *inside* the restroom.

■ If we are incorrect in our conclusion that the evidence does not support appellant's claim he was in custody at the time of the hospital questioning, we are persuaded that, at most, the evidence might be construed to show that he was under investigative detention at that time. It is settled law that a person may be detained briefly if the police have a particularized and objective basis for suspecting the person detained of criminal activity. *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The propriety of the detention's duration is judged by assessing whether the police diligently pursued a means of investigation that was likely to dispel or confirm their suspicions

quickly. *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *see* 3 LaFave, *Search and Seizure* § 9.2(f) (1987). The evidence here makes it plain that the police had reasonable grounds to suspect appellant of child abuse from the moment they were summoned by the clinic physician. Given that reasonable suspicion, the police were justified in "freezing" the situation for a short time—at least until the time of the hospital questioning—so as to make inquiry and arrive at a considered judgment about further action to be taken.

### B.

■ We conclude, too, that appellant was not in custody at the time of the videotaped questioning at the police station. Appellant concedes that he gave permission to the police officers to accompany him to his apartment, and the record reflects that he willingly acquiesced to their invitation to make a further statement at the police station. Although appellant may well have indicated a preference to retrieve his truck and/or return to the hospital rather than proceed to the police station, the evidence shows that he did not insist on that course of action and that he went to the police station voluntarily in order to "please" the police officers.

■ Even assuming *arguendo* that appellant was in custody unlawfully—because there was no arrest warrant—at the times of the videotaped questioning at the police station, we conclude that any "taint" on the videotapes was sufficiently attenuated to permit their use at trial. Our conclusion in this regard is based on three factors. First, although the police officers seem not to have realized it, probable cause clearly existed to arrest appellant by the time the videotaping commenced. The officers knew at least that a) the clinic physician suspected the child had been physically assaulted; b) the child's very appearance showed that she had been beaten nearly to death;[5] c) appellant admitted at the hospital that the child's injuries were sustained while she was in his care alone (*see* footnote 2); and d) what appeared to be a fresh bloodstain had been found in appellant's

---

**5.** Photographs of the child are in the record.

*See* footnote 2.

apartment near the child's bed. Second, even assuming *arguendo* the police officers' conduct was improper under state law, their conduct was nevertheless clearly not "purposeful and flagrant." Third, a review of the videotapes shows that appellant was given the *Miranda* warnings at the beginning of the questioning. Under these facts, any taint on the videotapes was attenuated and they were admissible at trial. *Self v. State, supra.*

## II.

■ Appellant's second point of error concerns his indictment, which reads in relevant part:

Ronny Brown, Jr., the defendant, on or about the 10th day of April A.D. 1985, ..., did then and there intentionally and knowingly engage in conduct that caused serious bodily injury to G___ D___ W___, a child younger than 14 years of age, by causing an object unknown to the Grand Jury to strike the head of said child.

Appellant argues the State put forth insufficient evidence to prove the grand jury used reasonable diligence to determine the means used to commit the offense charged. Appellant argues specifically that the indictment should have alleged that he injured the child by hitting her head with his fist because the grand jury had access to his videotaped statements wherein he admitted striking the child in that manner. *See* footnote 3.

Generally speaking, an indictment should allege the means used to commit the offense charged. However, an allegation that the accused committed the offense by some means unknown to the grand jury is sufficient if the State offers evidence that the grand jury used reasonable diligence to ascertain the nature of the instrument used. *Jackson v. State,* 516 S.W.2d 167 (Tex.Cr.App.1974); *Washington v. State,* 662 S.W.2d 653 (Tex.App.1983, no pet.).

Grand Jury Foreman Bernice Hart testified at trial that the grand jurors ques-

tioned (unspecified) witnesses; that they reviewed the child's hospital records and autopsy report and photographs;[6] and that they examined photographs of the interior of appellant's residence; but that they were unable to determine the nature of the instrument used to commit the charged offense. We hold that Hart's testimony was sufficient to show the grand jury did in fact use reasonable diligence. The grand jury was not required to rely upon the accuracy of appellant's videotaped statements. *See Persons v. State,* 714 S.W.2d 475 (Tex.App.—1986) (grand jury may allege injury to child inflicted by unknown manner and means if, despite due diligence, manner and means not determinable). Point of error two is overruled.

## III.

■ In point of error three, appellant complains the trial court erred in not directing a verdict of acquittal because the State did not disprove appellant's assertions during the taped statements that the child was injured falling down stairs. *See* footnotes 4 and 5.

When the State has placed in evidence a statement of the accused, part of which is exculpatory, the State is bound thereby unless it disproves the exculpatory material beyond a reasonable doubt. *Ibanez v. State,* No. 69,330, Tex.Cr.App., June 11, 1986 (not yet reported); *Rogers v. State,* 687 S.W.2d 337 (Tex.Cr.App.1985); *Palafox v. State,* 608 S.W.2d 177 (Tex.Cr.App. 1980).[7] This voucher rule, as it is sometimes called, is two-fold: first, the statement must amount to an admission; second, it must contain an assertion which exculpates the accused from the charged offense. *Rogers v. State, supra.*

The voucher rule is not applicable under the facts of this cause. Assuming *arguendo* that appellant's three recorded statements amount to an admission of the charged offense, the claim that the child was injured falling down stairs was not necessarily exculpatory. Travis County Medical Examiner Roberto Bayardo testified that a simple stairway fall could not explain the number, pattern, and severity

---

6. The child died of her head injuries on April 12, 1985.

7. This voucher rule was overruled by Tex.R.Cr. Evid. 607 (West 1986) effective September 1, 1986. *See Ibanez v. State, supra.*

of the child's injuries. Thus, the jury could have believed appellant's claim regarding the alleged fall and still found him guilty of the offense charged based on his other statements (see footnote 5). Point of error three is overruled.

## IV.

■ Appellant argues next the trial court erred in failing to instruct the jury on the lesser included offense of injury to a child by criminal negligence. Appellant argues the instruction was required because there was evidence—appellant's claim on the recordings—that the child was injured falling down stairs at a time she was in appellant's care.

In determining whether a jury must be charged on a lesser included offense, a two-step analysis is used. First, the lesser included offense must be included *within the proof* necessary to establish the offense charged. Second, there must be some evidence in the record showing that if the defendant is guilty, he is guilty of only the lesser offense. *Moreno v. State,* 702 S.W.2d 636, 640 (Tex.Cr.App.1986); *see* Tex.Code Cr.P.Ann. art. 37.09(1) (1981); *see* 3 Teague, *Texas Criminal Practice Guide* § 73.06[5][b] (1986).

It is immediately apparent that appellant's proposed instruction fails the first step in the analysis. The indictment alleged that appellant committed the offense "by causing an object ... to strike the head of [the] child"; thus, proof that the child *fell down stairs while in appellant's care* is not *within the proof* necessary to establish *the offense charged.* The crime about which appellant sought an instruction is simply not included in the indictment; therefore, the trial court did not err in refusing the instruction. Point of error four is overruled.

## V.

Appellant argues in point of error five that the trial court erred in instructing the jury on the law of parole as mandated by Tex.Code Cr.P.Ann. art. 37.07 § 4 (Supp. 1987). Appellant argues that, as applied to

8. Appellant did not object to the charge at trial.

him, § 4 operates as an *ex post facto* law because the charged offense occurred before the effective date of § 4.

This precise contention was decided adversely to appellant in *Alvarado v. State,* 723 S.W.2d 318 (Tex.App.—1987). Point of error five is overruled.

## VI.

■ In point of error six, appellant contends the indictment in this cause is fundamentally defective because "the allegation of the culpable mental states of intentionally and knowingly relate to the conduct engaged in rather than the result."

It is true that § 22.04 is a "specific result" crime; that is, the culpable mental state relates not to the defendant's conduct, but to the result of that conduct. *Alvarado v. State,* 704 S.W.2d 36 (Tex.Cr. App.1985); *Beggs v. State,* 597 S.W.2d 375 (Tex.Cr.App.1980). However, in *Beggs* the Court of Criminal Appeals expressly stated that the allegation that the accused "intentionally and knowingly engage[d] in conduct that caused serious bodily injury" to the child, which is precisely the language contained in the instant indictment, was

an allegation (1) that it was [the defendant's] conscious objective or desire to cause serious bodily injury and (2) that she was aware that her conduct was reasonably certain to cause serious bodily injury.

597 S.W.2d at 377. Thus, the indictment in this cause does adequately allege that appellant intentionally and knowingly caused serious bodily injury to the child. Point of error six is overruled.

## VII.

In his seventh point of error, appellant contends the paragraph applying the law to the facts in the charge to the jury at the guilt stage was fundamentally defective.[8] As under the previous point of error, appellant argues that the application paragraph did not require the jury to find that he intentionally or knowingly caused the injuries to the child. As was his complaint

with respect to the indictment, and for the same reason, appellant's contention is without merit.[9]

The judgment of conviction is affirmed.

---

9. Although appellant does not raise this issue on appeal, we note that the definitions of "intentionally" and "knowingly" in the instant charge were subject to the same objection as was made by the defendant in *Alvarado v. State, supra.*

Absent an objection, however, we find that no egregious harm to appellant resulted. *Almanza v. State,* 686 S.W.2d 157, 160 (Tex.Cr.App.1984) (opinion on rehearing).