**Ronny Joe BROWN, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 443–89.**

Court of Criminal Appeals of Texas,
En Banc.

Oct. 24, 1990.

Allen F. Cazier, San Antonio, for appellant.

Ronald Earle, Dist. Atty., and Terrence Keel, Asst. Dist. Atty., Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

W.C. DAVIS, Judge.

Appellant was convicted of the offense of injury to a child and the jury assessed punishment at 65 years in the Texas Department of Corrections. V.T.C.A. Penal Code, § 22.04(a)(1). On original submission to the Court of Appeals, the conviction was affirmed. *Brown v. State,* 725 S.W.2d 801 (Tex.App.1987). We granted appellant's petition for discretionary review, vacated the judgment below, and remanded the cause for reconsideration in light of this Court's decision in *Rose v. State,* 752 S.W.2d 529 (Tex.Cr.App.1988) (opinion on rehearing). *Brown v. State,* 761 S.W.2d 4 (Tex.Cr.App.1988) (per curiam). On remand, the Court of Appeals applied *Rose* and again affirmed the conviction. *Brown v. State,* 764 S.W.2d 931 (Tex.Cr.App.1989). In the instant petition for discretionary review of the appeals court opinion on remand, we again granted review to determine the correctness of that decision. *See* Tex.R.App.P. 200(c)(1). For the reasons stated *infra,* we shall affirm the judgment of the court below.

In *Rose,* we listed several factors to consider in determining the harmlessness of instructing on the operation of parole law. These included (1) whether a "curative instruction" outside the statutory instructions was given, (2) the facts surrounding the offense and the heinous nature of the crime, and (3) the appellant's prior criminal record. Reviewing the facts of that case, we determined the statutory instructions made no contribution to the verdict or sentence assessed beyond a reasonable doubt. *See* Tex.R.App.P. 81(b)(2).

Subsequent to this Court's opinion on rehearing in the *Rose* case, as appellant correctly points out, there were a plethora of cases remanded to the Courts of Appeal for a harmless error analysis. The decisions handed down by the appeals courts in those cases reflected a lack of consistency between the different courts when analyzing the degree of error and its effect on the judgment. This Court finally decided *Arnold v. State,* 786 S.W.2d 295 (Tex.Cr.App. 1990), wherein it was held a *Rose* harmless error analysis pursuant to TEX.R.APP.P. 81(b)(2) requires the appellate reviewing court:

> to assay extant factors and circumstances germane to punishment, as we have evaluated them, for a likelihood that constitutional error conducive to introduction of offending parole matters into environment of a punishment proceeding affected jury deliberations, and thereby influenced jurors in assessing the terms of punishment reflected in their verdict.

*Arnold,* 786 S.W.2d at 313. To this end, nine factors were listed which will affect application of rule 81(b)(2). They include:

(1) Whether discussion of parole law or good time credits occurred during voir dire;

(2) The quantity and quality of allusions to parole or good time laws made during jury argument;

(3) Whether the jury sent notes to the judge during deliberations asking for clarification of parole or good time laws or their application to the defendant;

(4) The actual sentence assessed in light of the facts and circumstances of the case. The sentence's divisibility by three was viewed as one circumstance which could indicate consideration of parole laws since the statutory charge stated that prisoners became eligible for parole after serving one third of their sentence (this one-third quantity being computed as "flat time" in some circumstances but including good time credits in others);

(5) Entry of an affirmative finding of the use of a deadly weapon in the judgment;

(6) The facts of the particular case;

(7) The prior criminal record of the defendant;

(8) Whether other instructions concerning parole were given by the court in addition to the statutory instruction—particularly the 'traditional curative instruction';

(9) Whether defense counsel raised an objection to the parole law instruction.

*Id.* at 313–324. The relative weight or importance of the individual factors will vary from case to case. *Id.* Moreover, "it is important to stress that these factors are neither exhaustive nor universally applicable." *Newton v. State,* 784 S.W.2d 689 (Tex.Cr.App.1990), *citing with approval Arnold,* 786 S.W.2d at 298 (Campbell, J., concurring).

Although the Court of Appeals had our decision in *Rose* before them, that court did not have benefit of the more detailed analysis which evolved with the passage of time and culminated in our *Arnold* opinion. Since we believe, however, that the appeals court correctly focused upon the ultimate aggravating factor in the case and reached the correct result, we will analyze the error in terms of the listed *Arnold* factors instead of again remanding the cause to the court below. With the above in mind, we turn to the record in the case at bar.

The record reflects the State focused its case on injuries suffered by Gail Dianne Woodin on April 1st through 10th, 1985. Appellant and Jacqueline Woodin, the baby's mother, were cohabiting during this time. Woodin worked 12 to 18 hours a day, usually beginning around 3 o'clock in the morning. Although she paid for day care, Woodin was in the habit of leaving the child with appellant during the day since he was unemployed. From the first to the tenth day of April, 1985, the child was placed in day care only twice. Initially questioned regarding the April 1st incident, Woodin said she first became aware the child had suffered injury that afternoon

around 4:00 p.m. when she arrived home. The child had spent the afternoon with her godmother, Dianna Schmidt, after spending the morning hours with appellant. Shortly thereafter, appellant arrived home and Woodin questioned him about the large bump on the child's head which covered an area from the left side of the head over the ear to the middle of the skull. According to Woodin, appellant stated the child "must have fallen on her head or something" and then walked out of the house. When he returned a short time later, he told Woodin he had spoken to his mother, a registered nurse, by telephone, and that his mother had suggested the use of ice packs. Appellant had refused Woodin's suggestion that the child be taken to see a doctor.[1] He later explained the child had fallen down the stairs.

During the next week, Woodin worked a shift between the hours of 3:00 a.m. and 7:00 p.m. while appellant was left in charge of caring for the baby. The swelling had abated to some extent by this time, but bruising remained on top of the head, behind the ears, and around the child's face and eyes. Nevertheless, Woodin testified the child's behavior was "normal."

On April 10, 1985, after receiving no communications from appellant during the morning, she was called from work by the police with the message her daughter was listed in critical condition at Brackenridge Hospital after being first taken to a minor emergency clinic by appellant. Woodin rushed to the hospital where she found the child with fresh bruises on her back, buttocks, chest and face.

Pediatrician Dr. Rodolfo Barrera was called in by the minor emergency clinic to examine the Woodin baby on the morning of April 10th. Through his testimony the State introduced portions of the victim's patient history taken at both the clinic and at the hospital emergency room. He related the patient's history, as noted by the clinic's trauma room nurse, reflected the child was brought in with agonal respirations, a slow, labored breathing indicative

---

1. Appellant's mother testified at trial that if she had known the extent of the child's injuries on April 1st, she would have recommended the baby be taken to see a doctor.

of a person about to expire. An I.V. was started, the patient was intubated and oxygen was begun. The child's heart stopped with few subsequent complexes or electrical impulse activity, thereafter declining into ventricular tachycardia. She was successfully defibrillated and converted to normal sinus rhythm. However, her pupils remained fixed and dilated the entire time, and she had "bilateral periorbital ecchymosis", commonly called "raccoon's eyes", indicating a base or skull fracture. Upon palpitation of the back of her head in the occipital area, she also appeared to have a large skull fracture with scalp hematoma. Her prognosis was listed as "guarded to poor."

The records from Brackenridge Hospital reflect the victim was still comatose upon arrival at the emergency room. A neurologic examination utilizing caloric tests with ice and warm water to assess brain function were performed without response. EEGs obtained less than twenty-four hours after admission and again approximately twenty-four hours later were both isoelectric, confirming the neurologic tests. There was a total absence of electrical activity in the brain. Although the child would be kept on a respirator for several more hours to maintain spontaneous respiration, she was brain dead.[2]

Dr. Roberto Bayardo, Chief Medical Examiner for Travis County, performed the autopsy and testified from the report filed in the case. His external examination revealed a twenty-month-old female, poorly nourished. There were "numerous traumatic injuries throughout her body," with moderate swelling of the entire top of the victim's head extending over both sides of the head. Most of the child's head was covered with bruises which extended around the ears and down the neck. The majority of these bruises were at least a week old. The child's body was also severely bruised, with multiple bruises appearing on the chest and abdomen, the left buttocks and thigh area, the left knee and ankle, with two others on the back of the

right thigh and behind the right knee. There were bruises scattered throughout the back measuring ¾ of an inch in dimension. According to the doctor, most of these bruises appeared to be of more recent occurrence than the injury to the child's forehead. Through this witness, the State introduced photographs of the victim's body which were published to the jury.

In addition to the external examination, Dr. Bayardo also performed an internal exam in an attempt to determine the cause of death. Examination of the head area under the scalp showed massive and extensive bleeding mixed with particles of necrotic brain tissue, reflecting a fracture of the skull and laceration of the dura through which brain matter extruded. There were two separate sets of fractures. The older set was located just behind and above the left ear, extending from there toward the front of the head. According to the medical examiner, this injury was about a week old from the time the victim was pronounced dead, as measured by the formation of granulation, or early scar tissue, along the fracture. In his opinion, the point of impact above and behind the ear made it "most unusual" that the injury occurred by accident.

The second set of fractures were located over the left parietal eminence. From this point, multiple and larger fractures extended across the midline of the skull to the right side of the skull, ending almost by the right ear. Bayardo testified this injury occurred about three days before the child was pronounced dead at Brackenridge Hospital. In the medical examiner's opinion, death was caused as a result of the second set of fractures, due to the laceration of the dura and injury to the brain which followed. Bayardo opined the victim had been struck by some flat object with a smooth surface, such as a fist, a board, or a bat; otherwise, the object used would have cut or scraped the scalp. He, like Dr.

---

**2.** Gail Dianne Woodin was kept on a respirator until such time she was pronounced clinically dead. Doctors subsequently operated and re-

moved various organs from the child for transplant purposes.

Barrera, believed the child was "clinically dead" upon arrival at the hospital.

Sergeant Investigator Howard Keith Hall of the Austin Police Department was in his car when he received a radio message diverting him from the minor emergency clinic to Brackenridge Hospital. Hall initially identified the photos taken of the victim at the hospital. Appellant had been driven to the hospital by another officer and was voluntarily talking to officers in a "family room" adjacent to the emergency room area. After receiving permission from Jacqueline Woodin to take photographs in the apartment and appellant's consent to accompany them, officers drove to the residence and photographed appellant in a "reenactment" of the events as they allegedly occurred, culminating in appellant's description of the victim's fall from the top of the stairs. Appellant then agreed to return with the officers to the police station "to give a more precise statement of facts." To this end, two video recordings were made in which appellant discussed the injuries with officers. Both recordings, absent certain statements made by the officers interviewing appellant which incorporated certain unidentified physicians' assertions regarding the case, were viewed by the jury after the proper predicate was laid for admission.

On the first tape, appellant only admitted to "disciplining" the child victim, and told the interviewing officers the child's injuries must have been caused by a fall down the stairs at his apartment. Beginning with the second video recording, however, he admitted having a temper problem with corresponding and multiple acts of abuse against the twenty month old infant. According to appellant's reconstituted version of events, the victim suffered injuries on two occasions: Friday, April 1st and Wednesday, April 10th, the day he drove her to the minor emergency clinic. Friday morning he told the child to go downstairs and when she did not, he "backhanded" her two or three times with his fists. Later, appellant said he was upstairs when he

heard a noise and found the baby at the bottom of the stairs. Appellant finally admitted he had not seen the baby fall, but assumed she had fallen from some height. Still later the same day, appellant "exploded" when the child either "spilled something" or "wasn't eating." This time he struck the baby on top of her head with his fist. Appellant stated he did not hit the child on Saturday or Easter Sunday. He did not strike the child on Monday because she was "still black and blue," nor did he hit her on Tuesday. On Wednesday, April 10th, appellant first stated he struck the child "only once". When confronted with the fact he earlier stated he had struck the baby more than once, his story changed. It seems appellant beat the child in the morning after he spilled some coffee. He then took her into the bathroom and sat her on her child's toilet. While she was on the toilet, he "heard her" do something. Without further explanation, he merely told the officers, "I guess she upset me because I hit her." Upon further questioning, appellant admitted to hitting the victim three or four times, and admitted that the only injuries suffered by the victim on April 10th were caused by his hitting her.

██ In application of the *Arnold* factors, appellant does not claim any mention was made during voir dire regarding parole law or its effect.[3] There was an objection lodged by appellant during the charge conference, but it was directed at ex post facto application of the instruction to the instant case rather than the constitutionality of the statute. In any event, presence of an objection only goes to show defense counsel was not attempting to seek any advantage through the instruction, since the absence of an objection carries no penalty in waiving *Rose* error. *Arnold* at 302. Similarly, although there was no "additional curative instruction" given the jury, this factor is weighed in appellant's favor with minimal force since such an instruction "loses its value as a probative factor" when the record in a case clearly

---

**3.** Indeed, the record before us does not contain the panel voir dire, nor was same designated for   inclusion for appellate review.

suggests the jury discussed the parole law before assessing punishment. *Id.* at 311.

■ During jury argument at the punishment phase, defense counsel argued for a probated sentence based upon appellant's need for professional assistance as documented by defense expert Dr. Richard Coons. The prosecutor, in his closing argument, completely discounted the viability of probation, instead asking the jury to begin as a starting point in their deliberations the number of years appellant had "robbed" from the child victim. The comment which appellant argues forms the basis for weighing this factor in favor of the defense immediately followed:

> Anything less—you need to take away from him the number of years he took away from her and you already know by that charge that the law in Texas is that a defendant is eligible for parole after serving 20 years actual time, plus good conduct time, and quite frankly, I'm sorry I can't ask you for a stiffer penalty, but I can't ask you for anything, in good conscience, other than 99 years or life in the Texas Department of Corrections, and you may ask 'What's the difference?' Well, there isn't any difference.

As the Court of Appeals pointed out in its opinion, the prosecutor here did not urge the jury to increase punishment in order to delay appellant's first parole date. Nor was the panel invited to consider and utilize parole law in assessing a sentence. The context of the State's argument, first and last, was that the jury equalize the scales between appellant and victim by assessing a sentence of 99 years or life. The reference to parole law was both fleeting and within the context of assessing a maximum sentence not for reason of future possibilities of parole, but to punish with life for that life taken by force from the victim. If at all, such a passing mention, within the context stated, is of neutral weight on the scales of harmless error. The harmlessness of this statement is further underscored by the fact the jury, while sending out a note questioning who would be entitled to claim any fine assessed in the case,

did not question the court concerning the role of parole law on their deliberations.

In addition to the above, the record reflects there was no affirmative finding that a deadly weapon was used or exhibited during commission of the offense. Moreover, it is uncontroverted that the State failed to prove appellant had previously been convicted of any offense whatsoever. These factors are without doubt weighed in favor of the defense and against a showing of harmlessness. Coupled with the fact that parole law was mentioned during final argument by the prosecution, though in a context arguably neutral in character and effect, such might be the weight of the factors as to swing the scales in favor of a determination the error could not be harmless. However, just as in the case of a capital offense, where an affirmative finding under the second special issue may be sufficiently supported by the particular facts of an offense, so too may the above factors prove inconclusive to a determination of harm where the facts and circumstances surrounding a non-capital case, when weighed in terms of the sentence assessed, support a determination of harmless *Rose* error.

The facts of this case show a young man who, over a period of ten days, systematically beat a 21–month–old child to death. The photographs and medical testimony received in evidence leave no doubt the victim was traumatized by bruises over most of her lower body. The evidence reflects she suffered not only the terminal beating about her head; she received an earlier beating from appellant severe enough to fracture her skull and cause bruising from one side of her head to the other, down the sides of her skull, and into her face, causing the condition commonly called "raccoon eyes", the result of massive and extensive bleeding under the scalp. The victim could neither ask for assistance nor repel appellant's ongoing assault as might be expected of an adult; testimony showed she was still of the age when she would fall as she struggled to walk.

We are not given much in the way of mitigation for this heinous offense. On the

one hand, the defense expert, based upon interviews with appellant's mother, suggested appellant's "problem" could be a product of his abusive environment as a child. While certainly admissible and worthy of consideration by the jury, that panel by its verdict weighed the evidence and found such excuse wanting in this particular cause. Appellant's admission on videotape to the effect he did not strike the child during certain days of the week between the first and tenth days of the month because she was "still black and blue", together with his method of administering "discipline" by beating the child about the head and neck may well have played a part in the jury's rejection of appellant's "problem" defense. His problem, as finally admitted on the second video recording, is one of temper rather than of ignorance or socialization. Here was a man of average or better intelligence, whom testimony showed had a child of his own.[4] Before moving in with Jacqueline Woodin and her baby, appellant was made aware the child was part of the relationship. During the week in question, appellant volunteered to look after the child, even though day care was already paid. The child was not thrust upon him; he volunteered to take care of the baby. After fracturing her skull for the first time on April 1st, appellant failed both to seek medical assistance for the child and to remove what was obviously an irritant from his presence by taking advantage of day care. Moreover, there is some evidence the abuse had been occurring for some time. There was testimony from the victim's mother and godmother that the child was scared of appellant and would "holler" in his presence. There was also evidence of resentment for the child's place in her mother's affections, and overall neglect of the child except for the unwanted attention subject of this review.

As punishment for his acts, appellant was not assessed the maximum sentence sought by the State, but was given a 65 year sentence without any fine. This sentence is not readily divisible by three and

thus is not circumstantial evidence the jury considered the operation of parole laws in assessing punishment. *See and compare Arnold*, 786 S.W.2d at 306. Given the arguments by both the State and defense, a mid-range sentence such as the one here does not appear to lend support to the proposition the jury considered parole law.

It is in this middle-ground type of case, where an appellant receives a mid-range sentence despite such egregious facts and the prosecution's attempts to at least indirectly inform the jury of information the panel is not privileged to know, that runs most closely to the line between harmful and harmless error. In the instant case, the heinous result of appellant's conduct over a period of days, as shown by the "before" and "after" photographs, would support an even lengthier sentence than that assessed, regardless of the quantitative factoring of his future parole date. Yet the jury, perhaps in response to appellant's expert testimony, did not assess the maximum or utilize the parole law formula in either an overt or implicit manner before arriving at the 65 year sentence. Given the circumstances surrounding this offense, we hold beyond a reasonable doubt that the parole instruction made no contribution to the punishment assessed in this case. R. 81(b)(2), *supra*.

The judgment of the trial court and the Court of Appeals is affirmed.

McCORMICK, P.J., concurs in the result.

CLINTON and TEAGUE, JJ., dissent.

STURNS, J., not participating.

---

4. Appellant had apparently fathered a child while living with a woman in Odessa before moving to Travis County.