IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 1, 2011 Session

**STATE OF TENNESSEE v. VERNON MOTLEY**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-06801      Lee V. Coffee, Judge**

**No. W2010-01989-CCA-R3-CD  - Filed March 29, 2012**

The defendant, Vernon Motley, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder and sentenced to life imprisonment. On appeal, he argues that: (1) the trial court gave an improper jury instruction on premeditation; (2) the trial court erred when it did not grant the defendant's motion for a mistrial based on a Brady violation; (3) the trial court erred when it allowed testimony of the victim's dying declaration to include information concerning the motive for the killing; and (4) the State's argument during closing was improper and amounted to plain error. After review, we affirm the judgment of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Claiborne H. Ferguson and Samuel Rodriguez, III, Memphis, Tennessee, for the appellant, Vernon Motley.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Jennifer Nichols, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant was charged with first degree premeditated murder after the mother of his child's new boyfriend and father-to-be of her baby, Eric Deon Brown, the victim, was shot and killed outside a home at 2164 Hubert Circle in Memphis.

At trial, Tyrone Jackson, the victim's brother, identified photographs of the victim for the record.

Kendrick Buckley testified that he visited his cousin, Shaka Jones, on February 22, 2008 at the home of Jones's grandmother on Hubert Circle. The two went to get pizza and then sat across the street from Jones's grandmother's house in Buckley's truck, talking. While they were sitting in the truck, the defendant pulled up in front of the house, and "about that time [Jones] was telling [him] to pull off" or leave. As he was leaving, Buckley saw the defendant get out of his car and walk up to the porch of Jones's grandmother's house. Buckley drove to his house approximately thirty minutes away. As he was driving, Jones received calls on her cell phone, which made her "upset, real excited, real upset. Constantly hollering and screaming." He recalled that Jones was exclaiming that the victim had been shot. The next day, the police had Buckley view a photographic array from which he identified the defendant as the man he saw "walk up to the porch [at Hubert Circle]."

Shaka Jones testified that she and the defendant were involved in an "off and on" relationship for fourteen years and had a child together. Their relationship ended and, in the latter part of 2007, Jones began dating the victim. She was pregnant with the victim's baby on February 22, 2008. The defendant was not happy about Jones's pregnancy and had threatened "to kill [her], [her] baby, [the victim] and [Jones's] other kids." Jones had not told the defendant that the victim was the father of her unborn baby, but she "guess[ed] he took it upon himself to assume that's who the baby's daddy was" because of his having observed the two together and conducting his own investigation.

Jones testified that, on January 19, 2008, her and the defendant's almost twelve-year-old son, "Lil Vernon," called from his visit with the defendant and "told [her] that [she] needed to bring him all of his belongings . . . because [the defendant] was taking him and [she] wasn't going to get him back[.]" "Lil Vernon" also relayed that the defendant threatened to kill him, Jones, and Jones's other son if Jones did not comply. Jones eventually sought help from the defendant's mother who was able to get "Lil Vernon" back. After that, Jones stayed away from the defendant and even moved without letting anyone know where she was living because of the defendant's threats. Jones also stayed away from the victim "because [she] took heed into what [the defendant] had said."

Jones testified that, on February 22, 2008, she was sitting with her cousin, Kendrick Buckley, in Buckley's truck outside her grandmother's house on Hubert Circle waiting for her children to come home from a Mardi Gras celebration at school. She saw the defendant pull up in his mother's Chrysler Pacifica, get out of the car, and walk up to her grandmother's porch at "[a] fast pace." Alarmed because of the threats the defendant had

-2-

made, Jones told Buckley to drive away. Jones called her grandmother to see if the defendant was in her house, and her grandmother informed her that he was not. A few minutes later, Stephanie Blanton, Jones's grandmother's next-door neighbor, called and told Jones that the victim had been shot and was bleeding to death on her front porch. Jones acknowledged that neither the victim, Torre Smith, nor anyone else was around when the defendant arrived at Hubert Circle. Later, Jones gave a statement to the police and identified the defendant in a photographic array as the person she saw at her grandmother's house the night of the murder.

Torre Smith, the victim's cousin, testified that he accompanied the victim to Hubert Circle on February 22, 2008. The victim drove the two of them in Smith's car. The victim stopped in front of a white house, got out, and walked up to the front porch. He knocked on the front door, looked in the window, and then walked to the house next door, all the while talking on his cell phone. As the victim was walking to the house next door, "a car c[a]me speeding up behind [Smith's] car and a gentleman jumped out, running with a pistol and saying, 'I've been waiting to catch you,' and he shot right when he got by [Smith's] window, but he was running and [the victim] took out running." The victim ran behind the houses, and the gunman chased him. Smith moved into the driver's seat and drove down the street to see if he could intercept the victim. However, he heard more gunshots and did not see the victim, so he drove back to the original location in time to see the gunman getting into a Chrysler Pacifica. Smith followed the gunman and got a partial license plate number, which he relayed to 911. Smith drove back to Hubert Circle where he saw the victim lying on the front porch "convulsing." Later, Smith told the police what he had seen, including a description of the gunman, but he was unable to identify the gunman in a photographic array.

Akil Payne testified that he lived on Hubert Circle next door to Jones's grandmother. Payne knew the victim because the victim had dated both Payne's sister, Kimberly Blanton, and Shaka Jones. Payne knew the defendant as well, who was usually referred to as "V" or a few times as "Lil V." On the evening of February 22, 2008, Payne was in his house with his stepfather, Rickey Dunlap, when he heard gunshots outside. Payne looked out the window and saw a blue Chrysler Pacifica, which he recognized as the defendant's mother's car, parked in front of Jones's grandmother's house. When the shooting stopped, Payne's sister knocked on the door and said that the victim had been shot. Payne opened the door and saw the victim lying on the front porch. Payne knelt down, held the victim in his arms, and asked him what had happened. The victim told him, "V shot me." Payne asked if he meant "Shaka's baby daddy," and the victim confirmed that it was. The victim told him that the defendant shot him "[o]ver Shaka." The victim said, "I don't think I'm going to make this one" and began praying.

Officer Russell Mooney with the Memphis Police Department testified that he responded to the dispatch call to the scene that evening. When he arrived, he saw the victim lying on the front porch of the house. He called for an ambulance and secured the crime scene. He noticed some shell casings on the ground and pointed them out to the crime scene officers.

Officer Jeffrey Garey with the Memphis Police Department Crime Scene Unit testified that he reported to the Regional Medical Center where he photographed the victim and tagged his property.

Sergeant James Smith with the Memphis Police Department Crime Scene Unit testified that he photographed the crime scene and collected evidence. Among the evidence collected were three spent forty-five caliber shell casings: one on the sidewalk in the front of the house and two near the back porch of the house. He also found a red Samsung cell phone in the grass at the front of the house.

Gwendolyn Motley, the defendant's mother, testified that the police came to her house the night of February 22, 2008, looking for the defendant and asking about her 2005 Chrysler Pacifica. The defendant had been to her house earlier that evening, but she was not sure where he was when the police arrived. She acknowledged that the defendant drove her car at times but did not recall whether he had driven it that evening. The car was at her house when the police arrived.

Shelva Stafford of the Shelby County Clerk's Office testified that Tennessee license plate 755NLL was registered to Gwendolyn Motley.

Detective Patrick Parson with the Memphis Police Department testified that, as an officer on the criminal apprehension team, he was one of the officers who went to Gwendolyn Motley's house looking for the defendant that night. Motley was very nice and responsive and gave Detective Parson consent to search her home, but the defendant was not in the house. Motley told Detective Parson that the defendant had driven her Pacifica that day, including when he went to the store around 6:00 p.m. and again around 7:00 p.m. when "he left the house . . . and she had no whereabouts on where he was." She did not know how her vehicle got back in her driveway where it was when the officers arrived.

Sergeant Anthony Mullins with the Memphis Police Department Homicide Bureau testified that he was the case coordinator in this case. Sergeant Mullins interviewed Shaka Jones, Kendrick Buckley, Torre Smith, and Akil Payne. Based on what the witnesses told him, he determined that Jones and Buckley were on Hubert Circle but left when the defendant arrived. The victim and Smith arrived after Jones and Buckley had gone, and then

the defendant "pull[ed] up after [the victim] g[o]t[] out, but they're on opposite sides of the street in different times." Sergeant Mullins did not suspect Jones of having played a role in the murder. He did not request gunshot residue testing on the victim because there was no indication that he had a gun. Sergeant Mullins obtained a warrant for the defendant's arrest, but, despite receiving numerous tips, the police were unable to find him until April 2009.

Officer Billy Byrd with the Memphis Police Department's Criminal Apprehension Team testified that he was part of the team that arrested the defendant at a Microtel Inn in Memphis. The team had to break down the motel room door and the bathroom door to apprehend the defendant.

Dr. Karen Chancellor, chief medical examiner for Shelby County, testified that she performed the autopsy on the victim. Dr. Chancellor observed a gunshot wound to the left side of the victim's body with the bullet still inside the body. The bullet passed through the victim's left kidney, pancreas, and liver and damaged the inferior vena cava, causing the victim to bleed to death internally. She noted that the victim had "some superficial abrasions on the forehead," which she speculated may have been caused when the victim fell after being shot. Dr. Chancellor recovered the bullet from the victim's right chest cavity and tagged it as evidence.

Agent Cervinia Braswell, a firearms examiner for the Tennessee Bureau of Investigation, testified that she examined the ballistics evidence in this case. Agent Braswell determined that the cartridge cases found at the crime scene were all fired from the same firearm. She determined that the bullet recovered from the victim's body was the same caliber as the casings and consistent with the manufacturer of the casings.

After the conclusion of the proof, the jury convicted the defendant, as charged, of first degree premeditated murder.

## ANALYSIS

### I. Jury Instruction

The defendant argues that the trial court committed reversible error by giving an expanded jury instruction on premeditation. The State agrees that it was error to give the expanded charge but asserts that such error was harmless.

The trial court gave this instruction following its pattern jury instruction on premeditation:

The Court further charges you that the element[ ] of premeditation may be inferred from the circumstances of the killing. The element of premeditation is a factual question to be determined by the jury from all the circumstances surrounding the killing. Several circumstances may be indicative of premeditation, including declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence and calmness immediately after the killing. A jury is not limited to any specific evidence in finding or inferring premeditation, but premeditation may be established by any evidence from which a rational jury may infer that the killing occurred after the exercise of reflection and judgment. In addition to these factors, the establishment of the motive for the killing is yet another factor from which the jury may infer premeditation.

Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987); see also State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998). A charge is prejudicially erroneous "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Vann, 976 S.W.2d at 101; State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

In State v. Hollis, 342 S.W.3d 43 (Tenn. Crim. App. 2011), this court reversed a defendant's first degree premeditated murder conviction and remanded for a new trial based on the trial court's use of a similar expanded jury instruction on the element of premeditation. Relying on this court's earlier analysis in State v. Brandon Compton, No. E2005-01419-CCA-R3-CD, 2006 WL 2924992 (Tenn. Crim. App. Oct. 13, 2006), perm. to appeal denied (Tenn. Feb. 26, 2007), in which this court noted that the factors listed by a trial court as indicative of premeditation were incomplete statements of the law, this court concluded that the expanded definition was not only misleading to the jury but also constituted an impermissible comment upon the evidence:

In this case, we, likewise, conclude that the almost identically worded special instruction issued by the trial court contained an incomplete statement of the law and was therefore misleading to the jury. In addition, we agree

with the defendant that it constituted an impermissible comment by the trial court upon the evidence. In its defense of the special instruction, the trial court stressed that the language came directly from the opinions of our supreme court. The court also expressed its concern that juries, without such a special instruction, have no "clue" as to which factors to consider in support of premeditation. The quoted language, however, developed in the context of our supreme court's evaluation of the sufficiency of the evidence in first degree murder cases to determine whether there was sufficient proof, from all evidence presented, by which a rational jury could have reasonably inferred premeditation. The list of factors is "not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done 'after the exercise of reflection and judgment.'" State v. Rodney E. Howard, No. M2009-02081-CCA-R3-CD, 2010 WL 3774544, at *9 (Tenn. Crim. App. Sept. 29, 2010) (quoting Tenn. Code Ann. § 39-13-202(d)); see also State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004). In our view, by instructing the jury on specific factors, many of which were present in the case, that "might, if proven, tend to indicate the existence of premeditation," the trial court moved beyond providing a mere statement of the law and into the area of commenting on the evidence by directing the jury's attention to certain aspects of the proof presented in the case.

Hollis, 342 S.W.3d at 51.

This court further concluded that because the instruction misstated the element of premeditation, it fell "within the category of a non-structural constitutional error that requires reversal of the conviction unless harmless beyond a reasonable doubt." Id. at 51-52 (citation omitted). In such a case, the proper inquiry is not whether a guilty verdict would surely have been rendered in a trial without the error, but instead whether the guilty verdict rendered in the trial "was surely unattributable to error." Id. at 52 (internal quotations and citations omitted).

After review, we are convinced that the proof of premeditation was overwhelming in this case. Shaka Jones testified that, when the defendant found out she was pregnant, he threatened to kill her, her baby, and the victim. She said that she avoided contact with the defendant and changed residences because of the defendant's threats. She said that she also avoided the victim because she took the defendant's threats seriously. Torre Smith testified that he saw the defendant run toward the victim, saying, "I've been waiting to catch you" and shoot at him as he was running away. There was no evidence that the victim was armed. After the crime, the defendant eluded apprehension for fourteen months, thus effectively

secreting any evidence. In light of this evidence of premeditation, we conclude that the jury's guilty verdict was "surely unattributable" to the erroneous jury instruction.

## II. **Brady** Violation

The defendant argues that the trial court erred when it did not grant his motion for a mistrial after the State improperly withheld exculpatory evidence that Shaka Jones had told the police that two people told her that the defendant and the victim were fighting before the shooting.

Whether to declare a mistrial lies within the sound discretion of the trial court, and its decision in this regard will not be overturned on appeal absent a showing of an abuse of discretion. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id. (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)); State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527 (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). In order to establish a Brady violation, a defendant must show that he or she requested the information, the State suppressed the information, the information was favorable to his or her defense, and the information was material. State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is "material" only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 682 (1985). The burden of proving a Brady violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. Edgin, 902 S.W.2d at 389.

After Shaka Jones testified on direct examination, the State gave the defendant, as Jencks material, a copy of Jones's statement to police in which she told officers that Stephanie Blanton and Rickey Dunlap had told her that the defendant and the victim had engaged in a fistfight prior to the shooting. Specifically, Jones's statement recounted:

Stephanie called me back about fifteen minutes later and told me that Rickey said that [the victim] had been shot on their porch. From last night they gave me more information about [the victim] and [the defendant] had been out there fighting before even the shooting had occurred. They said that [the victim] gave up and he stopped fighting with him and that's when [the defendant] started shooting at him. That's when they said that the young man that was with [the victim] pulled off and left.

The defendant asserted that the statement contained exculpatory evidence, which the State failed to turn over, and requested a mistrial. In denying the defendant's request for a mistrial, the court found that the evidence was not exculpatory in light of the theory of defense and also that it was "inculpatory to a certain degree" in that it placed the defendant at the scene of the shooting engaged in a fight with the victim. The court also noted that the State had provided the names of the potential witnesses mentioned in the statement prior to trial.

On appeal, the defendant argues that evidence that the defendant and the victim engaged in a fistfight prior to the shooting was favorable to the defense because it negated the element of premeditation and somewhat contradicted Torre Smith's account of the events in question. He asserts that the court erred in assessing the nature of the evidence in light of his theory of defense.

Upon review, we conclude that the State arguably committed a Brady violation by not disclosing evidence of the fight between the victim and the defendant because such evidence, viewed in the light most favorable to the defendant, could easily be viewed as having inflamed the passion of the defendant so as to cloud his judgment with regard to premeditation and was thus favorable to the defendant. However, the failure to disclose the evidence was harmless beyond a reasonable doubt in light of the overwhelming proof of premeditation, as discussed earlier, in this case.

### III. Dying Declaration

The defendant argues that the trial court erred in allowing testimony concerning the victim's dying declaration to include information regarding the motive for the killing.

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Id. 802. The dying declaration is one such exception to the hearsay rule. Rule 804(b)(2) of the Tennessee Rules of Evidence provides

-9-

that "a statement made by a declarant while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death" is an exception to the rule against hearsay.

This court has noted that a statement must satisfy the following five elements to qualify as a dying declaration: (1) the declarant must be dead at the time of the trial; (2) the statement is admissible only in the prosecution of a criminal homicide; (3) the declarant must be the victim of the homicide; (4) the statement must concern the cause or the circumstances of the death; and (5) the declarant must have made the statement under the belief that death was imminent. State v. Hampton, 24 S.W.3d 823, 828-29 (Tenn. Crim. App. 2000). The last requirement provides the indicia of reliability and truth that justifies admission of the statement. See Neil P. Cohen et al., Tennessee Law of Evidence, § 8.35[2][f] (5th ed. 2005). "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001). As such, we will not reverse the trial court's ruling absent a showing that it abused its discretion. Id.

At trial, Akil Payne testified that, after he found the victim lying on his front porch, he knelt down, held the victim in his arms, and asked him what had happened. The victim responded, "V shot me." When Payne asked the victim why the defendant shot him, the victim said, "Over Shaka." The victim then told Payne that "[he] d[id]n't think [he was] going to make this one" and began praying.

The evidence clearly shows that the five conditions for establishing a dying declaration were satisfied, and the defendant does not contest as much. Instead, the defendant argues that the victim's dying declaration should not have been allowed to include speculation as to the defendant's motive.

Our supreme count in State v. Lewis, 235 S.W.3d 136, 149 (Tenn. 2007), considered a similar challenge to a dying declaration. In Lewis, the trial court admitted the victim's statement "that he 'knew' the 'lady with the vases' was involved in the offenses[.]" Id. at 146. The defendant argued that the statement was merely an opinion and should not have been permitted as a dying declaration. Id. The court reviewed the history concerning the dying declaration exception and acknowledged that "[c]ases pre-dating the adoption of our rules of evidence," including Still v. State, 140 S.W. 298 (Tenn. 1911), which was relied on by the defendant in this case, "have been understandably inconsistent when considering the admissibility of an opinion expressed as part of a dying declaration." Id. at 148-50. The court noted that "[t]he traditional authorities have recognized that the general rule, which allows a statement of fact but precludes a mere opinion, often created confusion in the effort to separate one from the other." Id. at 150 (citation omitted). The court reasoned that,

"[b]ecause a dying declaration is essentially a substitute for the testimony of the victim, the admissible evidence is limited to that to which the victim could have testified if present," the admissibility of which is governed by Rule 701 of the Tennessee Rules of Evidence. Id. Accordingly, the court held that the victim's statement was properly admissible as a dying declaration because it was "'rationally based upon the perception' of the victim," and the victim would have been permitted to offer the testimony at trial. Id.

Rule 701 of the Tennessee Rules of Evidence, which governs the admission of opinion evidence by a lay witness, states:

> If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
>
> (1) rationally based on the perception of the witness and
>
> (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 701(a). We cannot conclude that the victim's opinion of the defendant's motive for the shooting was admissible under the Lewis standard, i.e., that the victim would have been able to testify to such if present at the trial. However, the court's error in allowing such dying declaration testimony concerning the defendant's motive for the killing was harmless beyond a reasonable doubt as the defendant's motive being "[o]ver Shaka" was thoroughly brought out through Shaka Jones's testimony.

## IV. Closing Argument

The defendant asserts that the State committed prosecutorial misconduct during closing argument by "blatant[ly] misstat[ing]" the law on premeditation and that the trial court erred in failing to, *sua sponte*, grant a mistrial or issue a curative instruction.

The defendant acknowledges that no contemporaneous objection was made at trial. For this court to grant relief based on an error for which no objection was raised, the error must be plain error. In order for us to find plain error:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

-11-

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, they must be shown to have prejudiced the case by affecting the jury's verdict. Middlebrooks, 995 S.W.2d at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Id. at 560.

The defendant argues that the prosecutor misled the jury about the inferences it could draw from the evidence when she stated, "You've heard through the medical examiner that the cause of [the victim's] death was a gunshot wound, a homicide. Not natural causes, not suicide, not an accident. Homicide. That's premeditation." However, the defendant's assertion fails to place the prosecutor's statement in context. The disputed language was at

the end of the prosecutor's discussion concerning the evidence the jury could consider in determining the existence of premeditation. In context, the prosecutor told the jury:

> Premeditated? Absolutely. He declared his intention to kill [the victim] as well as others, before he did it. He procured that weapon. He used that weapon on an unarmed man and he either got rid of it, hid it or did something with it because it was never found, but you do know that all of those casings that were found on the ground around that house, were fired from the same weapon and you know that the bullet taken from [the victim]'s body is consistent with the same thing. You've heard that from Cerv[i]nia Braswell. You've heard through the medical examiner that the cause of his death was a gunshot wound, a homicide. Not natural causes, not suicide, not an accident. Homicide. That's premeditation.

After reviewing the prosecutor's entire argument in context, it is clear that the prosecutor did not tell the jury that it could infer premeditation based solely on the medical examiner's testimony concerning the cause of death. Instead, the prosecutor merely described to the jury all of the proof it could look at in determining whether the element of premeditation was established. We conclude that the prosecutor's argument was legitimate and did not mislead the jury on the inferences it could draw from the evidence. As such, the defendant has not proven the breach of clear and unequivocal rule of law; therefore, there is no plain error in this case.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE