# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
September 14, 2010 Session

## STATE OF TENNESSEE v. CHUNCY LESOLUE HOLLIS

**Direct Appeal from the Circuit Court for Gibson County**
**No. 8551      Clayburn L. Peeples, Judge**

---

**No. W2009-02302-CCA-R3-CD  - Filed January 25, 2011**

---

The defendant, Chuncy Lesolue Hollis, was convicted by a Gibson County jury of first degree premeditated murder and sentenced to life imprisonment. In a timely appeal to this court, he challenges the sufficiency of the evidence and argues that the trial court erred by issuing an expanded jury instruction on the element of premeditation. Based on our review, we conclude that although the evidence was sufficient to sustain the jury's finding that the defendant premeditated the killing, the trial court committed reversible error by improperly commenting on the evidence and giving an incomplete statement of the law in its expanded premeditation instruction. Accordingly, we reverse the conviction and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and D. KELLY THOMAS, JR., JJ., joined.

Larry Copeland (at trial) and Joseph S. Ozment (on appeal), Memphis, Tennessee, for the appellant, Chuncy Lesolue Hollis.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Garry G. Brown, District Attorney General; and Edward L. Hardister and Harold E. (Hal) Dorsey, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arose out of the May 13, 2007 shooting death of Prentice Turner, which

occurred outside the W.J.O. Elks Lodge in Humboldt following an altercation between members of rival gangs. Several witnesses identified the defendant and Desmond Deshawn Ragland, also known as "TKO," as the shooters, and the Gibson County Grand Jury subsequently indicted both men for the first degree premeditated murder of the victim. The trial court granted the defendant's motion to sever his case from Ragland's, and in June 2009, the defendant proceeded to trial alone before a Gibson County jury.

### State's Proof

The State's first witness was Humboldt Assistant Chief of Police Bill Baker, who described his investigation of the case and identified various items of evidence that were introduced as trial exhibits. Among these were a photograph of a 2002 blue Toyota Camry that belonged to the defendant's former girlfriend, which was marked as Exhibit 23; a tape-recorded statement that Chief Baker took from the defendant on May 15, 2007; and the following ballistics items, which were found in the area of the shooting: three 9 millimeter Winchester cartridge casings, three 9 millimeter PMC cartridge casings, a 9 millimeter Remington Peters unfired cartridge, a 9 millimeter Winchester unfired cartridge, and a 9 millimeter magazine with four PMC bullets inside.

In the defendant's statement, which was played for the jury, the defendant related that there had been arguments all night inside the club between individuals from Jackson and other individuals from Humboldt. He denied, however, that he participated in the arguments or the physical altercation that took place outside. He said that he saw an individual known as TKO at the club that night, but TKO left before the shooting. He also stated that he did not know the victim.

Chief Baker testified that on the day following the statement, the defendant, who had a .45 automatic in his possession at the time he was taken into custody, told him that he had gone to his car and retrieved his weapon when the shooting at the club started but that he had never fired it. On cross-examination, Chief Baker acknowledged that his investigation revealed that there were approximately 350 people at the Elks Lodge at the time of the shooting. He further acknowledged that the witnesses' physical descriptions of the shooters were a bit vague, which, he said, he attributed to the chaotic nature of the scene and the early morning hour at which the shooting occurred.

Sergeant Tony Williams, an investigator with the Humboldt Police Department, testified that he transported the evidence collected in the case, including the cartridge casings, cartridges, magazine, a fired bullet that fell out of the victim's clothing or body in the emergency room, a bullet recovered from the victim's body during autopsy, and the victim's shirt, to the Tennessee Bureau of Investigation Laboratory for testing. On cross-

examination, he testified that several witnesses reported that the shooter was a short man with dark skin and dreadlocks. He said the defendant was developed as a suspect based on information supplied to a Jackson drug force task officer by an undercover informant who had reportedly witnessed the shooting.

Special Agent Steve Scott of the Tennessee Bureau of Investigation, an expert in firearms identification, testified that he determined that three of the cartridge cases were fired by one firearm while the other three were fired by a second firearm. He further determined that the two bullets recovered from the victim's body were fired through the barrel of the same gun and that a gunshot to the victim's back was fired at close range.

The State's next five witnesses, who were patrons of the Elks Lodge at the time of the shooting, all identified the defendant from photographic spreadsheets they were shown by the police during the course of the investigation. Lakosha Manley testified that she was standing outside the club shortly after midnight on May 13, 2007, when she saw two of her former high school classmates, Desmond Ragland and Pete Harris, accompanied by the defendant, exiting a Toyota Camry. On cross-examination, she testified that she described the defendant to the police as having dreadlocks and wearing a white t-shirt and plaid shorts. On redirect examination, she said that sometime after the shooting she saw the defendant's photograph in a newspaper, recognized him as the third man she had described to the police, and contacted Chief Baker with the information.

John Epperson testified that he was outside the Elks Lodge talking with a friend in a Suburban when he saw the defendant and Desmond Ragland walk to a Toyota Camry, where the defendant retrieved a handgun from under the dashboard. The defendant stuck the gun in his pants, and he and Ragland headed back toward the door to the club. Approximately five or ten seconds later, Epperson heard a loud commotion followed by several gunshots. Next, Ragland and the defendant came running back to the Toyota and the defendant, brandishing the gun, ordered Epperson's friend to move his "damn truck," which was blocking their exit. Epperson identified Exhibit 23 as the Toyota Camry from which the defendant had retrieved the gun.

Cameo Pankey, a friend of the victim's, testified that the defendant and some men from Jackson got into an altercation with some other men at the club. According to his testimony, the Jackson men were escorted outside but returned. At that point, the lights inside the club were turned on and the Jackson men were again escorted outside. About three minutes later, Pankey and the victim left the club and the victim was approached by TKO, as some other Jackson men, including the defendant, surrounded the pair. TKO took a swing at the victim, and the two men then started fighting.

Pankey testified that, until a bald-headed man fired a gunshot, he stood by to make sure that no one jumped the victim. At that point, he ducked back into the club. He said he heard approximately six or seven gunshots in total, and he peeked out the door to witness the defendant standing over the prone victim and shooting him at "point blank" range.

Larae Simpson testified that as the victim was fighting with another man outside the door to the club, the defendant walked rapidly past her toward his car and returned with a gun in his hand. At about the same time, a friend pulled her around the corner and she heard gunshots. On cross-examination, Simpson acknowledged that she first heard the gunshots as the defendant was walking back to the scene and that she never saw the defendant fire his gun.

Ranette Pettigrew testified that she was dancing outside the club when the defendant walked past her saying that "he was going to get his stuff out of the car." The defendant then went to a Toyota Camry, retrieved a pistol, returned, and fired approximately three shots into the air. Pettigrew stated that she hid behind a car and from that position heard approximately six more gunshots. When she emerged after the shooting had stopped, she saw the victim lying in front of the door and the defendant and some other young men walking toward the parking lot.

Marquita Anderson, the defendant's former girlfriend, identified Exhibit 23 as her 2002 blue Toyota Camry, which the defendant borrowed at 7:00 p.m. on May 12, 2007, and returned at 9:00 or 9:30 a.m. on May 13, 2007.

Dr. Thomas Deering, the forensic pathologist who conducted the autopsy of the victim's body, testified that the victim died of multiple gunshot wounds. The victim had four gunshot wounds, caused by either three or four separate bullets: a gunshot wound that started in his right neck and ended with a bullet in his left shoulder; a gunshot wound to the front of the right shoulder that exited at his back; a gunshot wound to the back that exited on the right side of the abdomen; and a gunshot wound in the back of the right hand that exited the front.

Ranata Spinks testified that she was partying at the Elks Lodge early on the morning of May 13, 2007 when she saw her brother and TKO engaged in an argument. She said that some individuals pulled her brother to the back of the club, and she followed TKO outside, where she saw him start fighting with the victim. The victim eventually ended up on the ground, and the defendant came up, pointed his gun down at the victim, and fired. Spinks, who fled at that point, was unable to say how many shots were fired, whether the defendant was the first person to shoot, or exactly how the victim ended up on the ground.

-4-

Courtney Thomas testified that sometime after midnight on May 13, 2007, he witnessed a verbal altercation inside the club between the defendant and Robert Spinks. He said that one man escorted Spinks to the back of the club while another man escorted the defendant outside. Thomas stated that he later exited the club to find the victim fighting with Ragland, also known as "TKO," while the defendant and others stood guard to ensure that it remained a one-on-one fight. He said that after approximately ten minutes of fighting, the victim ended up on the ground and the defendant stood over him and shot him two or three times.

Chief Baker, recalled by the State, testified that Desmond Ragland was known by the nickname "TKO."

## Defendant's Proof

Nicky Dean, the defendant's brother-in-law, testified that the defendant had a .45 caliber chrome or silver handgun at the time he was arrested. On cross-examination, he said he had no idea whether the defendant owned or had access to a nine millimeter weapon.

Elgin McKinley, who was the "House Chairman" of the Elks Lodge on May 13, 2007, testified that he came back into the club from outside, noticed an altercation taking place at the front door, and turned on the light. He then sent Robert Spinks to the back of the club and escorted three other men outside to the parking lot. As he was walking back, the victim exited the club and one of the three men that McKinley had just escorted outside, a man in dreadlocks, ran past him and began fighting with the victim. McKinley testified that he was on the phone with the police when he heard gunshots. When the shooting stopped and he emerged from his position of cover, he saw the victim lying on the ground. McKinley estimated that the fight at the door started within twenty seconds of the time he escorted the men to the parking lot and that the shooting occurred one to two minutes later. He also estimated that there were 175 to 200 people present at the club when the shooting occurred.

Terrence Anderson testified that the episode began with a verbal altercation that escalated into a physical fight inside the club. He said that he and his friends went out the front door and the fight then moved outside. At that point, the defendant and TKO ran past him toward the parking lot and then returned with guns. According to Anderson, the defendant fired his weapon into the air while TKO fired two to three shots at the victim.

Chauncey Ross, another eyewitness to the shooting, testified that the perpetrators of the victim's murder were a "light skinned fellow with braids" and a "dark skinned tall dude," neither of whom was present in the courtroom. On cross-examination, Ross denied that he had earlier told the prosecutor that he would not testify against the defendant or Ragland

-5-

because they were fellow Gangster Disciple members. He also denied having told Chief Baker that the first two shots were fired by a dark-skinned five foot, six inch tall man with "low cut hair." He acknowledged he had four prior convictions for possession of cocaine with intent to distribute, as well as a conviction for escape.

The defendant's final proof consisted of James Reed's statement to the police, which was read into evidence by stipulation of the parties. In the statement, Reed said that TKO told him that he had shot and killed a man at a club in Humboldt following an altercation between TKO's Gangster Disciple brothers and "a bunch of Crips."

## ANALYSIS

### I. Special Jury Instruction on Element of Premeditation

The defendant first contends that the trial court committed reversible error by improperly commenting on the evidence in its expanded jury instruction on premeditation. Over defense counsel's vigorous protests, the trial court granted the State's request that it provide the jury with an additional definition of premeditation. The court, therefore, issued the following instruction, which apparently consisted of its own modified version of the State's proposed instruction:

> Factors which might, if proven, tend to indicate the existence of premeditation include declarations previously made by a defendant of an intent to kill, evidence of procurement of a weapon by a defendant prior to a killing, use of a deadly weapon upon an unarmed victim, particular cruelty of a killing, infliction of multiple wounds, destruction or secretion of evidence of a killing and a defendant's calmness immediately after a killing. Should you find evidence of any such factor, you should give it such weight and value as you think it deserves along with all the other evidence in the case.

The defendant argues that because the instruction incorporated facts that had been introduced into evidence and directed the jury on the conclusion to reach based on those facts, it constituted an impermissible comment upon the evidence in violation of article VI, section 9 of the Tennessee Constitution, which provides that "[j]udges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." He further argues that the instruction was also misleading because it did not contain a complete, full, and accurate statement of the law. In support, he cites State v. Brandon Compton, No. E2005-01419-CCA-R3-CD, 2006 WL 2924992, at *9 (Tenn. Crim. App. Oct. 13, 2006), perm. to appeal denied (Tenn. Feb. 26, 2007), in which this court ruled that the trial court erred in issuing a similarly worded special jury instruction. The State agrees that the special

instruction contained an incomplete statement of the law. The State contends, however, that the error was harmless because, unlike in Compton, in which this court reduced the defendant's first degree murder conviction to second degree murder, there was substantial proof in the case at bar to support the jury's finding of premeditation.

Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987); see also State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998). A charge is prejudicially erroneous "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Vann, 976 S.W.2d at 101; State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). "The misstatement of an element in jury instructions is subject to constitutional harmless error analysis." State v. Faulkner, 154 S.W.3d 48, 60 (Tenn. 2005).

The special jury instruction in Compton read:

> The elements of premeditation and deliberation are questions for the jury that may be established by proof of the circumstances surrounding the killing. There are several factors that tend to support the existence of these elements which include: declarations by the defendant of an intent to kill, evidence of the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of the evidence of the murder, and calmness immediately after the killing.

2006 WL 2924992, at *6 (footnote omitted). In that case, we concluded that the instruction was a misstatement of the law because five of the factors listed in the instruction were incomplete:

> The Appellant is correct in his assertion that when applying the factor regarding procurement of a weapon, it is settled law that the evidence must show that the weapon was procured for use against the victim of the crime. [State v.] Jackson, 173 S.W.3d [401,] 410 n.5 [(Tenn. 2005)]; [State v.] West, 844 S.W.2d [144,] 148 [(Tenn. 1992)]. As noted, simply procuring or carrying a weapon is not a basis for inferring premeditation to kill a specific victim.

Likewise, it has been held that the State may not rely solely upon a defendant's acts of concealment of evidence after the crime to establish premeditation. West, 844 S.W.2d at 148; [State v.] Long, 45 S.W.3d [611,] 621 [(Tenn. Crim. App. 2000)]. The same has been found to be true with regard to the infliction of multiple wounds, as our supreme court has held that "repeated blows can be delivered in the heat of passion, with no design of reflection." [State v.] Brown, 836 S.W.2d [530,] 542 [(Tenn. 1992)]. Finally, our supreme court in Jackson impliedly held that the factor regarding the declaration of an intent to kill referred to a declaration of an intent to kill a specific victim, rather than to a general statement. Jackson, 173 S.W.3d at 409. Additionally, though not argued by the Appellant, the factor of use of a deadly weapon upon an unarmed victim has also been addressed and found, standing alone, to be insufficient to establish premeditation. [State v.] Tune, 872 S.W.2d [922,] 925 [(Tenn. Crim. App. 1993)].

Thus, while these factors provided to the jury by the special instruction recite those factors enumerated by the Tennessee Supreme Court in [State v.] Nichols, [24 S.W.3d 297, 302 (Tenn. 2000)] and Jackson as appropriate factors for consideration as to the presence of premeditation at trial, case law has expounded upon their application and has concluded that certain of these factors are insufficient in and of themselves to warrant a finding of premeditation. Moreover, the form of the special instruction and the specific language, "There are several factors that tend to support the existence of these elements which includes . . . [,]" comes perilously close to the constitutional prohibition of the trial judge commenting upon the evidence. See Tenn. Const. art. VI, § 9. After review, we conclude that instructing the jury with regard to the factors, without also instructing on their expanded application, could have misled the jury as to the applicable law. Thus, the jury instruction, as given, failed to give a complete and accurate instruction of the applicable law.

Id. at *7.

In this case, we, likewise, conclude that the almost identically worded special instruction issued by the trial court contained an incomplete statement of the law and was therefore misleading to the jury. In addition, we agree with the defendant that it constituted an impermissible comment by the trial court upon the evidence. In its defense of the special instruction, the trial court stressed that the language came directly from the opinions of our supreme court. The court also expressed its concern that juries, without such a special instruction, have no "clue" as to which factors to consider in support of premeditation. The quoted language, however, developed in the context of our supreme court's evaluation of the

sufficiency of the evidence in first degree murder cases to determine whether there was sufficient proof, from all evidence presented, by which a rational jury could have reasonably inferred premeditation. The list of factors is "not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done 'after the exercise of reflection and judgment.'" State v. Rodney E. Howard, No. M2009-02081-CCA-R3-CD, 2010 WL 3774544, at *9 (Tenn. Crim. App. Sept. 29, 2010) (quoting Tenn. Code Ann. § 39-13-202(d)); see also State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004). In our view, by instructing the jury on specific factors, many of which were present in the case, that "might, if proven, tend to indicate the existence of premeditation," the trial court moved beyond providing a mere statement of the law and into the area of commenting on the evidence by directing the jury's attention to certain aspects of the proof presented in the case.

The State contends that the special instruction falls within the category of a harmless, non-structural, non-constitutional error, asserting that there was substantial evidence in support of premeditation and that "there can be no doubt that the jury would have convicted the defendant of premeditated first degree murder even if the trial court had denied the State's requested instruction." We respectfully disagree. Because the instruction misstated the element of premeditation, it falls within the category of a non-structural constitutional error that requires reversal of the conviction unless harmless beyond a reasonable doubt. See State v. Paul Wallace Dinwiddie, Jr., No. E2009-01752-CCA-R3-CD, 2010 WL 2889098, at *10 (Tenn. Crim. App. July 23, 2010) (citing Hedgpeth v. Pulido, 129 S. Ct. 530, 532 (2008)), perm. to appeal dismissed (Tenn. Oct. 15, 2010). In such a case, "'[t]he inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to error.'" Id. at *11 (quoting Sullivan v. Louisiana, 508 U.S. 275, 279 (1993)). Here, the proof of premeditation, although sufficient to sustain the jury's verdict, was not overwhelming, and we are simply unable to conclude that the erroneous jury instruction did not have a "substantial and injurious effect or influence in determining the jury's verdict." Hedgpeth, 129 S. Ct. at 531 (citation omitted). We, therefore, reverse the conviction and remand for a new trial. Although our determination on this issue renders moot the defendant's sufficiency of evidence claim, we will nonetheless address it because of the possibility of further appellate review.

## II. Sufficiency of the Evidence

The defendant next challenges the sufficiency of the evidence in support of the element of premeditation, arguing that the proof showed that the shooting occurred "during a heated argument that evolved to a physical fight" and that had the jury "not been directed to facts that 'tend' to indicate premeditation[,] they could have very well have passed upon

first degree murder and considered a lesser charge."

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2006). "Premeditation" is defined in our criminal code as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for

any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). As previously discussed, our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. Jackson, 173 S.W.3d at 409; State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); Leach, 148 S.W.3d at 54; Nichols, 24 S.W.3d at 302; Bland, 958 S.W.2d at 660.

Viewed in the light most favorable to the State, the evidence established that the defendant, who was not an active participant in the physical fight that took place between the victim and Ragland, went to his car, retrieved his gun, returned to the scene of the fight, and then fired multiple gunshots at the prone victim, including at least one at point blank range. There was no evidence that the victim was armed, and the pathologist who performed the autopsy of his body determined that one of the gunshots he sustained was fired at close range to his back. This evidence was sufficient to support a finding of premeditation. We conclude, therefore, that the evidence was sufficient to sustain the defendant's conviction for first degree premeditated murder.

## CONCLUSION

Based on our review, we conclude that the evidence was sufficient to sustain the defendant's first degree premeditated murder conviction but that the trial court erred by issuing an expanded definition of premeditation. We further conclude that the error was not harmless beyond a reasonable doubt. Accordingly, we reverse the conviction and remand for a new trial.

_____
ALAN E. GLENN, JUDGE