IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 1, 2024 Session

## OSAYAMIEN OGBEIWI v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 06-01475      Chris Craft, Judge**
_____

**No. W2024-00095-CCA-R3-PC**
_____

Petitioner, Osayamien Ogbeiwi, was convicted of first degree premeditated murder and was sentenced to life imprisonment. This court upheld Petitioner's conviction on direct appeal. Petitioner subsequently filed a petition for post-conviction relief, alleging that he received ineffective assistance of counsel at trial and on appeal. Following a hearing, the post-conviction court denied the petition. On appeal, Petitioner maintains that his counsel was ineffective in (1) failing to challenge an expanded jury instruction on premeditation at trial and on appeal; (2) advising him to testify regarding self-defense and in failing to request a jury instruction on self-defense and in failing to challenge the lack of an instruction on appeal; and (3) failing to adequately challenge the admission of DNA evidence at trial and on appeal. Petitioner also maintains that he was denied due process due to the State's failure to provide his capias in discovery during the post-conviction proceedings. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Terrell L. Tooten (at hearing and on appeal) and Paul Guibao (at hearing), Memphis, Tennessee, for the appellant, Osayamien Ogbeiwi.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Facts and Procedural History

### A. Trial

Petitioner was indicted on charges of felony murder and first degree premeditated murder following his shooting and killing Ali Abdiaziz, a Citgo convenience store clerk, during the early morning hours of December 20, 2005, in Memphis. *See State v. Ogbeiwi*, No. W2010-00117-CCA-R3-CD, 2011 WL 3276188, at *1 (Tenn. Crim. App. July 29, 2011), *perm. app. denied* (Tenn. Nov. 15, 2011). The shooting was captured on the store's surveillance cameras, and the State entered the recordings as exhibits and played them during the July 2009 trial. The recordings showed that Petitioner and two others entered the store wearing hoods and masks, that Petitioner removed his gun from his holster, and that the two others exited the store. *Id.* at *17. Petitioner approached the victim; they exchanged gunfire; and the victim fell. *Id.* Petitioner started to leave the store but then removed his hood, returned to the victim, and fired one more shot while the victim was on the floor and was trying to move away from Petitioner. *Id.* The victim appeared to have grabbed his torso following the last shot. *Id.* A customer found the victim and called 911. *Id.* at *1. The victim was transported by ambulance to a hospital, where he died from his injuries. *Id.* at *1, 4, 6.

Dr. Lisa Funte, an assistant medical examiner for Shelby County, testified that an autopsy revealed that the victim was shot three times. *Id.* at *6. "One bullet entered the victim's right shoulder and exited straight out his back; one bullet entered the left side of his chest and exited from the lower right side of his back; and a third bullet entered the victim's right cheek and exited under his chin." *Id.* Dr. Funte testified that the trajectory of the bullet that entered the victim's chest was from up to down and that the bullet caused "'pretty major injuries,' including damage to the pancreas, small intestine, liver, inferior vena cava, and kidney." *Id.* at *18.

Following the shooting, Petitioner arrived at a hospital with two other men and sought treatment for gunshot wounds that he received during the shooting. *See id*. at *2, 4, 7. Once Petitioner was inside the hospital, the other men drove away. *Id.* at *2. Medical personnel gathered Petitioner's personal effects and clothing, including his gray pants, which appeared to have blood on them, and gave the items and clothing to a police officer who took them to the Memphis Police Department's (MPD) property room. *Id.* at *3. No money was among Petitioner's personal effects. *Id.* at *4. The officers also collected the victim's personal effects, including almost $1,000 that was in his wallet. *Id.* at *3.

MPD Sergeant Andrew Kjellin attempted to ascertain Petitioner's identity while at the hospital, but Petitioner refused to respond. *Id.* at *4. MPD Officer James Luckett went to the hospital to obtain a thumb print from Petitioner and then returned to speak to Petitioner, "who was considered a suspect '[d]ue to the circumstances of him arriving'" at the hospital. *Id.* During the second visit, Officer Luckett advised Petitioner of his rights, and Petitioner declined to speak to him or provide a DNA swab. *Id.* After Officer Luckett obtained a search warrant, he returned to the hospital and procured DNA swabs from Petitioner. *Id.* Officer Luckett sent the DNA swabs, fluid samples, gray pants from the property room, and the victim's blood samples to the Tennessee Bureau of Investigation (TBI) for testing. *Id.* TBI Special Agent Donna Nelson analyzed samples of possible bloodstains from the convenience store and compared them to known samples from Petitioner and the victim. *Id.*at *5. She determined that both the victim's blood and Petitioner's blood were at the scene of the shooting. *Id.*

Demetria Love, the mother of Petitioner's children, testified for the defense at trial. *Id.* at *6. Ms. Love stated that prior to the shooting, one of Petitioner's friends had stolen a dog from Petitioner that Petitioner had purchased for $1200 and that the two were in an ongoing altercation over the dog. *Id.* According to Ms. Love, a few days prior to the shooting at the Citgo, Petitioner's friend "shot up" Ms. Love's car while Petitioner and their son were inside. *Id.* Ms. Love acknowledged that they did not file a police report regarding the stolen dog or the shooting of her car, and she explained that they lived in a "pretty rough" area and that she did not believe the police took complaints from their area seriously. *Id.*

Ms. Love testified that on the night of the shooting, she overheard Petitioner arguing with someone over the telephone after which Petitioner left their apartment. *Id.* At one point, Petitioner told her that he planned to retrieve the dog, but he did not tell her that he was leaving to retrieve the dog on the night of the shooting. *Id.* Ms. Love stated that following the shooting, Petitioner went to Jamaica to stay with friends while he recovered from his gunshot wounds. *Id.* She said that Petitioner returned after learning that a warrant had been issued for his arrest and that he was arrested while reentering the United States *Id.*

Petitioner elected to testify in his own defense and admitted that he was the man in the surveillance video who entered the store and shot the victim. *Id.* at *7. He stated that at the time of the shooting, he was a security guard and was licensed to carry the gun used in the offense, but he later acknowledged that his handgun carry permit had been rescinded at the time of the shooting. *Id.*at *7, 8.

Petitioner testified that prior to the shooting, "Blue," whom he had believed to be a friend, stole an expensive dog that Petitioner had purchased for his son. *Id.*at *7. Two

- 3 -

days before the shooting at Citgo, Petitioner went to meet Blue, believing that Blue would be returning the dog. *Id.* Petitioner stated that when he and his son arrived at the location of the meeting, Blue shot at his car, and Petitioner drove away. *Id.* After Petitioner spoke to Blue on the night of the shooting at Citgo, Petitioner and two friends went to The Memphis Inn, which was located approximately one block from Citgo, to meet "Blue" about the dog. *Id.* As they were walking past an abandoned business, someone who appeared to be Blue got out of a car and began shooting at them. *Id.* Petitioner stated that in taking cover from the gunfire, he ran to Citgo, which was the closest store. *Id.* He acknowledged that he and his two friends had their faces covered and their hoods pulled up when they entered Citgo, and he explained that "[t]hey were already pulled over when we were going to get up with Blue." *Id.* at *8. Petitioner further explained that he wore the hoodie because he believed "Blue" would shoot at him and that he planned to shoot back at Blue. *Id.* Petitioner said he did not anticipate Blue shooting at him the way he did, and Petitioner panicked because no one had ever shot at him previously. *Id.*

Petitioner testified that he retrieved his gun once inside the store and that the victim, upon seeing Petitioner's gun, also pulled out a gun. *Id.* at *7. Petitioner stated that although he told the victim, "Whoa, whoa, whoa," the victim shot him in the foot and chest and that Petitioner "just returned fire." *Id.* Petitioner said that upon leaving the store, he realized that the victim's gun was near the victim's hand and "ran back to get the gun. But [the victim] had the gun in his hand, and [Petitioner] grabbed the gun when it went off, boom. When it went off, that's when [Petitioner] snatched it out of his hand, and [Petitioner] ran out of the store." *Id.* Petitioner maintained that the round did not strike the victim, that the victim was shot three times during the initial exchange of gunfire, and that the victim had been standing when Petitioner shot him in the chest, even though the medical examiner concluded that the victim's gunshot wound to his chest was at a downward angle. *Id.* at *7, 8.

Petitioner testified that he fled because he was afraid and wounded and that his two friends transported him to a hospital. *Id.* at *7. Following Petitioner's release from the hospital, he went to Jamaica to stay with friends because he knew he "was going to have to deal with this situation eventually, but [he] didn't want to have to come to jail with the bullet holes in [his] leg, in [his] foot, in [his] chest[.]" *Id.* He said that upon learning of the warrant for his arrest, he arranged to return to Memphis and turned himself in to authorities. *Id.* He denied going to Citgo with the intent to commit a robbery or kill the victim. *Id.*

The State presented rebuttal testimony from Lieutenant Luckett that MPD received no reports of other shootings in the area on the night that the victim was killed. *Id.* at *8.

The jury convicted Petitioner of first degree premeditated murder as charged in the second count of the indictment, and the trial court sentenced Petitioner to a term of life imprisonment. *Id.* The jury was unable to reach a verdict on the charge of felony murder in the first count of the indictment, and the court declared a mistrial on that count. *Id.* The court announced that the first count of the indictment was "dismissed by operation of law," finding that any retrial on the first count would violate double jeopardy principles in light of the jury's verdict finding Petitioner guilty of first degree premeditated murder.

## B. Motion for New Trial and Direct Appeal

Petitioner filed a timely motion for new trial, raising numerous issues. The trial court denied the motion following a hearing, and Petitioner filed a timely notice of appeal. Petitioner raised eight issues on direct appeal, including a claim that the trial court erred in denying his motion to suppress his personal clothing seized from the hospital and later used for DNA testing and a challenge to the sufficiency of the evidence. *Id.* at *1, 10. This court concluded that Petitioner was not entitled to relief on any of the issues raised. *Id.* at *1.

This court concluded that Petitioner's argument regarding the suppression of his clothing and the test results from the clothing was "moot" because the State obtained a search warrant, which Petitioner did not challenge, and thereby obtained swabs of Petitioner's DNA. *Id.* at *12. This court noted that the search warrant was not included in the appellate record, that no proof regarding the basis for the search warrant was in the record, that it did not appear that Petitioner contested the legality of the search warrant in the trial court, and that this court presumed "that the warrant would have been contested had there been a basis for contesting it." *Id.*

In concluding that the evidence was sufficient to support Petitioner's conviction for first degree premeditated murder, we reasoned:

> The evidence in this case, specifically the store surveillance video and Dr. Funte's testimony, when viewed in the light most favorable to the State, establishes that [Petitioner] killed the victim "after the exercise of reflection and judgment." The video showed that [Petitioner] and two confederates walked into the Citgo store wearing hoods and masks. [Petitioner] removed his gun from his holster, and his two confederates left the store. [Petitioner] approached the victim, and the two exchanged gunfire while in a standing position. The victim fell down and [Petitioner] started to leave the store. However, [Petitioner] removed his hood, returned to the victim, and fired one more shot as the victim tried to move away. It appears as though the victim grabbed his torso after the last shot.

- 5 -

Dr. Funte testified that the gunshot wound to the chest caused "pretty major injuries," including damage to the pancreas, small intestine, liver, inferior vena cava, and kidney and that the trajectory was from up to down. Given the angle of the chest wound and the video showing the victim grabbing his torso after the last shot, a rational trier of fact could conclude that [Petitioner], instead of leaving the store, returned to the victim to fire a final shot to ensure his death. Moreover, [Petitioner] failed to render aid to the victim, which permits the jury to infer that [Petitioner's] actions were premeditated. *See State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). It was within the province of the jury to reject [Petitioner's] assertion that the gun accidentally fired when he returned to the victim to remove the gun from his hand. In addition, as already addressed above, there was sufficient proof that "the individual in the indictment or in the video had actually been killed."

*Id.* at *17-18. After this court issued its opinion affirming the trial court's judgment on July 29, 2011, the Tennessee Supreme Court denied Petitioner's application for permission to appeal on November 15, 2011.

### C. Post-Conviction Proceedings

On November 14, 2012, Petitioner filed a pro se petition for post-conviction relief, asserting ineffective assistance of counsel at trial. Following the appointment of counsel, Petitioner filed multiple amended petitions in which he alleged that he received ineffective assistance of counsel at trial and on appeal. An evidentiary hearing was held on August 4, 2023, during which the attorney who had represented Petitioner at trial and on appeal (Counsel) and Petitioner testified.[1]

Counsel testified that he had been practicing law for approximately thirty years and that by 2009, he had tried "[w]ell over" 100 trials, including many murder trials and trials in which self-defense was an issue. Due to the passage of time between the trial and the post-conviction hearing, Counsel was unable to recall many of the details of the case. Counsel recalled communicating with Petitioner often throughout his representation.

Counsel testified that the theory of defense was that Petitioner "react[ed] in self-defense" after the victim pulled out a gun at the convenience store. Counsel explained:

---

[1] The post-conviction court stated in its order that the lengthy delay was due to the appointment and subsequent withdrawal of attorneys who left the practice of law in Shelby County, obtained other employment, or experienced health issues and due to the recusal of the original post-conviction judge at Petitioner's request. Neither party raises an issue on appeal regarding the delay.

So [Petitioner] would've been an innocent person coming into—not breaking the law at the time was coming into—because I believe unlawful possession of a weapon precluded you from a self-defense argument at that time. Came in the store, sees the store owner because he's being chased. The store owner ups a gun and [Petitioner] fires back in self-defense.

Counsel testified, "If I'm off a little bit[,] the record will reflect better."

Counsel described self-defense in this case as "sort of a far-fetched defense." He stated that he initially sought to argue that the identity of the shooter was not apparent in the surveillance recording but that Petitioner wanted to "put himself in there with the story about the dog," that Petitioner's story was not consistent with the recording, and that the recording "just didn't portray a self-defense." Counsel said the recording was "extremely graphic" and included sound, which was rare. He recalled that "one of the biggest problems" for the defense was that the recording depicted the victim lying on the ground, gasping for air, and trying to crawl away when Petitioner fired the final shot. Counsel agreed that the recording was consistent with the medical examiner's testimony that the final shot was fired at a downward angle, and Counsel stated that the final shot was a "difficult thing to overcome." Counsel said he and Petitioner discussed Petitioner's testifying at trial, and Counsel did not agree with Petitioner's decision to do so. Counsel did not recall requesting a jury instruction on self-defense at trial, and he agreed that the trial court did not instruct the jury on self-defense.

Counsel believed he filed a motion to suppress and raised the trial court's denial of the motion as an issue on direct appeal. He did not recall the specific grounds raised in the motion but agreed with post-conviction counsel's statement that the suppression motion challenged the seizure of Petitioner's clothing from the hospital and later use of the clothing for DNA testing. Counsel could not recall whether he challenged the search warrant and stated that the language used in this court's opinion on direct appeal "probably meant that I had reviewed [the search warrant]. And if I had thought there was a reasonable ground to contest it, I would've filed something." Counsel also agreed that his strategy was to argue that any illegality in the seizure of Petitioner's clothing also extended to evidence collected pursuant to the search warrant.

Counsel agreed that he did not challenge the jury instruction on premeditation at trial, in the motion for new trial, or on appeal. He also agreed that had he been aware of case law holding that the premeditation instruction was erroneous, he would have raised the issue.

Petitioner testified that Counsel met with him twice at the jail, which included the weekend before trial, and Counsel met with him once or twice while Petitioner was in the

holding area following court appearances. Petitioner said that Counsel generally sent other attorneys from his firm to the court appearances and that those attorneys met with Petitioner on less than ten occasions. Petitioner stated that he did not receive discovery until two or three years into the case and that he did not have the opportunity to review discovery with Counsel.

Petitioner testified that he did not have the opportunity to discuss the search warrant affidavit with Counsel and that Counsel failed to challenge the search warrant in the trial court and on appeal. Petitioner stated that the times included in the search warrant affidavit were incorrect and that the affidavit incorrectly stated that he gave a false name while at the hospital. He denied telling hospital personnel that his name was "James Woodard." He did not recall an officer testifying that hospital personnel indicated Petitioner had given them a different name upon his arrival or Lieutenant Luckett's testimony that he obtained Petitioner's thumbprint to ascertain his identity.

Petitioner stated that he met with Counsel prior to trial regarding whether he should testify in his own defense. Petitioner said Counsel told him that "they got the DNA and I don't know what else to do but put you up here on the stand and try to explain what happened." Petitioner said Counsel told him that his testimony could serve as "mitigation" but that "there wasn't a self-defense law in the State of Tennessee." Petitioner faulted Counsel for failing to request a jury instruction on self-defense and for failing to raise the absence of the instruction as an issue in the motion for new trial.

Petitioner recalled concerns about the chain of custody of the DNA evidence, stating that "it came up missing for some time, for some years. And then it just appeared out of the blue." He faulted Counsel for failing to challenge the chain of custody of the DNA evidence at trial, in the motion for new trial, and on appeal. Petitioner acknowledged that officers testified at trial about discovering a sealed envelope containing Petitioner's DNA swab that was inside a larger, unmarked envelope. He acknowledged that Counsel questioned the officers on cross-examination at trial regarding the chain of custody issues.

Following the evidentiary hearing, the post-conviction court entered an order on December 19, 2023, making extensive findings and denying Petitioner's post-conviction petition. The post-conviction court found that Petitioner failed to establish at least one of the prongs of the *Strickland* standard for every alleged instance of ineffective assistance of counsel. Petitioner timely appealed the judgment of the post-conviction court.

## II. Analysis

### A. Post-Conviction Standard of Review

To obtain post-conviction relief, a petitioner must establish his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. A petitioner bears the burden of proving the factual allegations contained in the petition by clear and convincing evidence. *Id*. § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 296 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Appellate courts do not reassess the post-conviction court's determination of the credibility of witnesses. *Dellinger*, 279 S.W.3d at 292 (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the post-conviction judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). On appeal, a post-conviction court's factual findings will not be disturbed unless the evidence contained in the record preponderates against the findings. *Brooks v. State*, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988); *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). On the other hand, conclusions of law are given no presumption of correctness on appeal. *Dellinger*, 279 S.W.3d at 293; *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). We review "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013) (first citing *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011); and then citing *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011)).

### B. Ineffective Assistance of Counsel

On appeal, Petitioner asserts that he received ineffective assistance of counsel at trial and on direct appeal. He maintains that counsel was ineffective in (1) failing to challenge an expanded jury instruction on premeditation at trial and on appeal; (2) advising him to testify regarding self-defense and in failing to request a jury instruction on self-defense and in failing to challenge the lack of an instruction on appeal; and (3) failing to adequately challenge the admission of DNA evidence at trial and on appeal. We will address each of Petitioner's contentions in turn.

Both the United States Constitution and the Constitution of the State of Tennessee guarantee criminal defendants the right to effective assistance of counsel. U.S. Const. amend VI; Tenn. Const. art. I, § 9. Under the Sixth Amendment to the United States Constitution, when a petitioner raises an ineffective assistance of counsel claim, the burden is on the petitioner to show both (1) counsel's performance was deficient and (2) the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). To prevail on such a claim, a petitioner must prove both prongs of the *Strickland* test, and failure to prove either is "a sufficient basis to deny relief on the claim." *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "[A] court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

To prove that counsel's performance was deficient, a petitioner must establish that his attorney's conduct fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. As our supreme court has held:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter v. Rose*, 523 S.W.2d 930, 934-35 (Tenn. 1975)). A reviewing "court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation." *Alley v. State*, 958 S.W.2d 138, 149 (Tenn. Crim. App. 1997) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). A reviewing court also cannot criticize a sound, but unsuccessful, tactical decision made during the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).

To prove prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. As such, a petitioner must establish that his or her attorney's deficient performance was of such magnitude that he was deprived of a

- 10 -

fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *Burns*, 6 S.W.3d at 463). In the context of a claim of ineffective assistance of appellate counsel, the petitioner must show that there was a reasonable probability that the issue "would have affected the result of the appeal." *Campbell v. State*, 904 S.W.2d 594, 597 (Tenn. 1995) (citing *Evitts v. Lucey*, 469 U.S. 387 (1985)).

### 1. Jury Instruction on Premeditation

Petitioner maintains that Counsel was ineffective in failing to challenge the trial court's expanded jury instruction on premeditation at trial and in failing to raise the issue in the motion for new trial and on direct appeal. Petitioner alleges that the trial court erroneously issued the following jury instruction:

> The [c]ourt further charges you that the elements of premeditation may be inferred from the circumstances of the killing. The element of premeditation is a factual question to be determined by the jury from all the circumstances surrounding the killing. Several circumstances may be indicative of premeditation, including, but not limited to: declarations by the defendant of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, the infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, the destruction or secretion of evidence of the killing and calmness immediately after the killing. A jury is not limited to any specific evidence in finding or inferring premeditation, but it may be established by any evidence from which a rational jury may infer that the killing occurred after the exercise of reflection and judgment. In addition to these factors, the establishment of the motive for the killing is yet another factor from which the jury may infer premeditation.

Petitioner relies upon this court's holding in *State v. Compton*, issued prior to Petitioner's trial, in which this court held that a similar jury instruction was erroneous. *See State v. Compton*, No. E2005-01419-CCA-R3-CD, 2006 WL 3924992, at *6-8 (Tenn. Crim. App. Oct. 13, 2006) *perm. app. denied* (Tenn. Feb. 26, 2007). Petitioner contends that in light of this court's conclusion in *Compton*, Counsel was deficient in failing to object to the premeditation jury instruction at trial and in failing to raise the issue in his motion for new trial and on direct appeal. Petitioner further contends that Counsel's deficient performance resulted in prejudice.

The State responds that although the instruction issued by the trial court in the instant case was erroneous, the nature of the error was not settled at the time of Petitioner's trial and motion for new trial proceedings. The State maintains that the holding in *Compton*

was dicta and that "the propriety of the jury instruction did not become settled law until this Court decided and published [*State v.*] *Hollis*," in which this court likewise concluded that a similar jury instruction was erroneous. *See State v. Hollis*, 342 S.W.3d 43, 51-52 (Tenn. Crim. App. 2011). The State argues that *Hollis* was not "decided and published" until "well after" Petitioner's trial and motion for new trial proceedings and that, therefore, Counsel was not deficient in failing to challenge the premeditation jury instruction. The State also argues that Petitioner has not shown prejudice because the jury's verdict was "surely unattributable" to the erroneous instruction.

Almost three years before Petitioner's July 2009 trial, this court released its opinion in *State v. Compton*, in which we concluded that the evidence was insufficient to support the defendant's conviction for first degree premeditated murder due to the lack of sufficient evidence of premeditation and that the evidence, instead, was sufficient to support a conviction for second degree murder. *Compton*, 2006 WL 2924992, at *5-6. This court then addressed the premeditation jury instruction, concluding that the instruction was not "a complete and accurate instruction of the applicable law." *Id.* at *7. This court reasoned that although the jury instruction recited the factors recognized by our supreme court as appropriate in considering the presence of premeditation, "case law has expounded upon their application and has concluded that certain of these factors are insufficient in and of themselves to warrant a finding of premeditation." *Id.* We explained:

> The [defendant] is correct in his assertion that when applying the factor regarding procurement of a weapon, it is settled law that the evidence must show that the weapon was procured for use against the victim of the crime. As noted, simply procuring or carrying a weapon is not a basis for inferring premeditation to kill a specific victim. Likewise, it has been held that the State may not rely solely upon a defendant's acts of concealment of evidence after the crime to establish premeditation. The same has been found to be true with regard to the infliction of multiple wounds, as our supreme court has held that "repeated blows can be delivered in the heat of passion, with no design of reflection." Finally, our supreme court . . . impliedly held that the factor regarding the declaration of an intent to kill referred to a declaration of an intent to kill a specific victim, rather than to a general statement. Additionally, though not argued by the [defendant], the factor of use of a deadly weapon upon an unarmed victim has also been addressed and found, standing alone, to be insufficient to establish premeditation.

*Id.* (internal citations omitted). This court noted that the language in the instruction that "'[t]here are several factors that tend to support the existence of these elements which includes . . .[,]' comes perilously close to the constitutional prohibition of the trial judge commenting upon the evidence." *Id.* (citing Tenn. Const. art. VI, § 9). This court

- 12 -

concluded that "instructing the jury with regard to the factors, without also instructing on their expanded application, could have misled the jury as to the applicable law." *Id.* This court, however, did not address the effect of the erroneous jury instruction on the defendant's conviction. *See id.* at *7-8.

On January 25, 2011, this court filed its opinion in *State v. Hollis*, in which we relied upon the holding in *Compton* and concluded that a similar jury instruction on premeditation "contained an incomplete statement of the law and was therefore misleading to the jury" and "constituted an impermissible comment by the trial court upon the evidence." *Hollis*, 342 S.W.3d at 51. This court reasoned that the language used in the instruction was "developed in the context of our supreme court's evaluation of the sufficiency of the evidence in first degree murder cases to determine whether there was sufficient proof, from all evidence presented, by which a rational jury could have reasonably inferred premeditation" and that "[t]he list of factors is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done after the exercise of reflection and judgment." *Id.* (citations and internal quotation marks omitted). We concluded that:

> by instructing the jury on specific factors, many of which were present in this case, that "might, if proven, tend to indicate the existence of premeditation," the trial court moved beyond providing a mere statement of the law and into the area of commenting on the evidence by directing the jury's attention to certain aspects of the proof presented in this case."

*Id.*

In determining the effect of the error, this court stated that the instruction misstated the element of premeditation and that the error was a "non-structural constitutional error that requires reversal of the conviction unless harmless beyond a reasonable doubt." *Id.* at 51-52; *see Hedgpeth v. Pulido*, 555 U.S. 57, 60-61 (2008); *State v. Dinwiddie*, No. E2009-01752-CCA-R3-CD, 2010 WL 2889098, at *10 (Tenn. Crim. App. July 23, 2010). This court noted that inquiry required was "whether the guilty verdict actually rendered in this trial was surely unattributable to [the] error." *Hollis*, 342 S.W.3d at 52; *see Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993); *Dinwiddie*, 2010 WL 2889098, at *11. We reasoned that although the evidence of premeditation was sufficient to sustain the jury's verdict, the evidence was not overwhelming, and we were "unable to conclude that the erroneous jury instruction did not have a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Hollis*, 342 S.W.3d at 52 (quoting *Hedgpeth*, 555 U.S. at 58). Thus, we reversed the defendant's conviction and remanded the case for a new trial. *Id.*

The parties in *Hollis* did not file an application for permission to appeal to our supreme court, and the mandate was issued on April 5, 2011. It is unclear when the opinion was published in the Southwestern Reporter. This court subsequently applied the holdings in *Compton* and *Hollis* in multiple opinions and determined that similar expanded premeditation instructions were erroneous. *See e.g., State v. Motley*, No. W2010-01989-CCA-R3-CD, 2012 WL 1080479, at *4-6 (Tenn. Crim. App. Mar. 29, 2012) (noting that the State agreed that the expanded jury instruction was erroneous but concluding that the jury's guilty verdict was "surely unattributable" to the erroneous jury instruction due to the overwhelming evidence of premeditation); *State v. Spencer*, No. W2010-02455-CCA-R3-CD, 2011 WL 6147012, at *12-14 (Tenn. Crim. App. Dec. 8, 2011) (holding that the expanded jury instruction was erroneous and that because the evidence of premeditation was "not overwhelming," the court could not conclude that the jury verdict was "surely unattributable" to the erroneous jury instruction); *State v. Sykes*, No. W2009-02296-CCA-R3-CD, 2011 WL 2732660, at *8 (Tenn. Crim. App. July 14, 2011) (holding that the expanded jury instruction was erroneous and that in light of the defendant's admission to shooting the victim and his claim of self-defense, the court could not conclude that the guilty verdict was "surely unattributable" to the erroneous instruction).

The record reflects that *Compton* was decided almost three years prior to Petitioner's trial and that *Hollis* was decided during the pendency of Petitioner's direct appeal. Regardless, we need not determine whether Counsel was deficient in failing to object to the instruction at trial or raise the issue in the motion for new trial based on an unreported case from 2006 or in failing to raise the issue on direct appeal following the release of *Hollis* because the post-conviction court properly concluded that Petitioner failed to establish that any deficiency resulted in prejudice. *See Goad*, 938 S.W.2d at 369.

In the post-conviction court's order denying Petitioner's petition for post-conviction relief, the court reviewed each factor listed in the expanded instruction and noted that no evidence was presented pertaining to most of the factors. The court also noted that the jurors were instructed that they were not limited to any specific evidence in finding or inferring premeditation and that premeditation may be established by any evidence from which a rational jury may infer that the killing occurred following the exercise of reflection and judgment. The court found that under the "*peculiar facts of this case*," Counsel's failure to object to the expanded instruction or raise the issue on appeal did not result in prejudice. (Emphasis in order.).

The evidence presented at trial included surveillance footage depicting both the video and the audio of the shooting. The video showed Petitioner and two men entering the store while wearing hoods and masks to conceal their faces. *Ogbeiwi*, 2011 WL 3276188, at *17. Petitioner removed his gun from his holster, and the two other men exited the store. *Id.* Petitioner approached the victim; they exchanged gunfire while they were

standing; the victim fell; and Petitioner started to leave the store. *Id.* The recording depicted the victim lying on the ground and moaning in pain. Petitioner removed his hood, returned to the victim, and fired one more shot as the victim was lying on the ground and attempting to crawl away. *Id.* The victim appeared to grab his torso after the final shot, and Dr. Funte testified that the gunshot wound to the chest caused "pretty major injuries" and that the trajectory of the bullet "was from up to down." *Id.* at *17-18. As this court noted in our opinion on direct appeal, "[g]iven the angle of the chest wound and the video showing the victim grabbing his torso after the last shot, a rational trier of fact could conclude that [Petitioner], instead of leaving the store, returned to the victim to fire a final shot to ensure his death." *Id.* at *18. Following the shooting, Petitioner did not attempt to render aid to the victim. *Id.* Petitioner went to the hospital where he refused to identify himself to officers, and he fled the country following his release.

Petitioner relies on the mistrial on the felony murder charge in arguing that Counsel's failure to challenge the inclusion of the expanded premeditation instruction resulted in prejudice. He maintains that the jury's failure to render a verdict on the felony murder charge indicated that the jury credited his testimony at trial and found that he was in the store for a lawful purpose, which "contradicts a belief that he was there to commit a premeditated crime." Petitioner was charged with felony murder during an attempt to perpetrate a robbery, an offense which does not include premeditation as an element. *See* Tenn. Code Ann. § 39-13-202(a)(2) (2002). The record does not include the basis upon which the jury was unable to render a verdict on the felony murder charge, and we decline to go behind the jury's verdict and engage in such speculation. Rather, because the State was not required to establish premeditation to sustain a conviction for felony murder, the jury's inability to reach a verdict on the felony murder charge does not contradict the jury's finding that Petitioner's killing the victim was premeditated.

We conclude that the record does not preponderate against the post-conviction court's finding that based on "*the peculiar facts of this case*," Counsel's failure to challenge the expanded premeditation instruction at trial or on appeal did not result in prejudice. The evidence presented at trial established that Petitioner killed the victim "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The State presented significant evidence of premeditation at trial, and the trial court also instructed the jury that premeditation may be established by any evidence from which a rational jury may infer that the killing occurred following the exercise of reflection and judgment. Therefore, the jury's verdict was "surely unattributable" to the erroneous instruction. *Hollis*, 342 S.W.3d at 52; *see Humphrey v. State*, No. W2013-01877-CCA-R3-PC, 2014 WL 4243761, at *8 (Tenn. Crim. App. Aug. 27, 2014) (concluding that because the jury's verdict was "surely unattributable" to the erroneous jury instruction on premeditation, the petitioner was not prejudiced by trial counsel's failure to challenge the instruction). Petitioner failed to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner is not entitled to relief on this issue.[2]

## 2. Self-Defense and Jury Instruction

Petitioner asserts that Counsel was ineffective in advising him to testify at trial regarding self-defense and in pursuing a theory of self-defense without ascertaining whether the trial court would instruct the jury on self-defense. Petitioner bases his claim on his and Counsel's testimony at the post-conviction hearing regarding the pursuit of a self-defense theory at trial.

Although Counsel testified at the post-conviction hearing regarding a self-defense theory at trial, he acknowledged that he was unable to recall some details of the case, and he deferred to the trial record. The post-conviction court found that the trial record established that Petitioner did not pursue a claim of self-defense at trial. The court found Petitioner's testimony at the post-conviction hearing that Counsel advised him to pursue self-defense at trial and that Petitioner believed he was claiming self-defense at trial contradicted Petitioner's trial testimony that he did not believe his killing the victim was "justifiable," that he was not claiming self-defense, and that he did not intend to kill the victim. When asked at trial whether he was "asking this jury to let you out of this because that man shot you first," Petitioner replied, "No, sir." The court found that Counsel did not argue during closing argument that Petitioner acted in self-defense but, instead, attempted to seek a conviction for a lesser-included offense. Accordingly, the evidence does not preponderate against the findings of the post-conviction court. Petitioner failed to establish that Counsel was deficient in pursuing a theory of self-defense because the evidence does not reflect that such a defense theory was, in fact, pursued at trial.

Petitioner next asserts that Counsel was ineffective in failing to request a jury instruction on self-defense and in failing to raise the trial court's failure to issue an instruction on self-defense as an issue on direct appeal. Petitioner, however, has waived this issue on appeal by failing to cite to any authority in his brief to support his claim that an instruction on self-defense was warranted. *See* Tenn. R. App. P. 27(a)(7)(A) (requiring an appellant to support issues raised on appeal with "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record"); Tenn. Ct. Crim. App. R. 10(b) (providing that issues raised by

---

[2] We note that the post-conviction court found that Counsel was not deficient in failing to object to the premeditation instruction or otherwise raise a claim regarding the instruction on direct appeal. However, in light of our conclusion, upholding the post-conviction court's determination that Petitioner failed to establish prejudice, we need not address the issue of deficiency.

an appellant that "are not support[ed] by argument, citation to authorities, or appropriate references to the record will be treated as waived").

### 3. Admission of DNA Evidence

Petitioner asserts that Counsel was ineffective in failing to challenge the chain of custody of the DNA evidence at trial. Petitioner, however, has waived this issue by failing to make any argument in his brief as to prejudice. *See* Tenn. Ct. Crim. App. R. 10(b); *see Claxton v. State*, No. W2023-01324-CCA-R3-PC, 2024 WL 4823661, at *2 (Tenn. Crim. App. Nov. 19, 2024) (concluding that the petitioner waived his claims of ineffective assistance of counsel on appeal by failing to argue deficiency or prejudice in his appellate brief). Particularly, he fails to argue that there is a reasonable probability that the result of the proceedings would have been different absent the DNA evidence connecting him to the crime scene when he admitted at trial that he was the shooter. *See Strickland*, 466 U.S. at 694.

Petitioner maintains that Counsel was ineffective in seeking suppression of his clothing and DNA evidence without including the search warrant in the appellate record because this court was unable to fully review his suppression issue on direct appeal due to the absence of the search warrant. He asserts that the search warrant included "material representations that were not accurate." Specifically, he contends that the search warrant included inconsistent information regarding the time of his arrival at the hospital and incorrectly stated that he gave a false name while at the hospital. Petitioner, however, has waived this issue by failing to cite to any authority in his brief to support his claim that the post-conviction court erred in concluding that he was not prejudiced based upon these alleged discrepancies. *See* Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b); *Claxton*, 2024 WL 4823661, at *2.

Finally, Petitioner includes a one-sentence argument in his brief that Counsel erred "in not having [Petitioner] testify at a suppression hearing." Again, Petitioner has waived this issue by failing to support his claim in his brief with argument and citations to authority. *See* Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b).

### C. Due Process Claim

Petitioner contends that his due process rights were violated due to the State's failure to provide his capias to him after the post-conviction court ordered the State to provide discovery. Petitioner urges this court to remand the matter to allow him to receive the capias. Petitioner, however, has waived this issue by raising it for the first time on appeal. *See Cauthern*, 145 S.W.3d at 599. Nevertheless, this court granted Petitioner's motion to supplement the appellate record, and the capias was filed as part of the supplemental record.

Petitioner fails to specify in his brief how the capias relates to his claim of ineffective assistance of counsel. Petitioner, therefore, is not entitled to relief on this issue.

## III. Conclusion

In consideration of the foregoing and the record as a whole, we affirm the judgment of the post-conviction court.

_____
s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE